

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00068-CR

PAUL JOSEPH LAIR, JR.                                                    APPELLANT

V.

THE STATE OF TEXAS                                                            STATE

----------

## FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant Paul Joseph Lair, Jr. appeals his convictions for one count of aggravated sexual assault of a child and one count of indecency with a child by contact. In three issues, Lair argues that the trial court abused its discretion by allowing the State's child forensic interviewer to testify as to "why" a child might make a "rolling disclosure"; that the trial court erred by allowing the State to

---

[1]*See* Tex. R. App. P. 47.4.

introduce evidence of what he claims is an extraneous offense without proper notice to him by the State; and that the trial court erred by denying his motion for mistrial after the trial court sustained both his objections to comments made by the State during closing arguments of the guilt/innocence phase of trial. We will affirm.

## II. BACKGROUND

After a divorce when Boy, born July 10, 2003,[2] was roughly three years old, working mother (Mom) needed childcare for Boy. Having children around Boy's age, Mom's sister (Wife) and Wife's husband (Lair), offered to help for free. It was decided that Boy would stay overnight with Lair and Wife frequently on Friday nights because Mom worked Saturdays. It was not unusual for Lair to buy candy and toys for the children, Boy's toys were often "better than everyone else's," and Boy described Lair as his "best friend." Boy typically slept in the room with Lair, but Lair's own children slept in their own rooms and Wife slept on the couch. By Wife's account, she and Lair were more like "roommates" than husband and wife. By Mom's account, Lair and Boy had a father-and-son-like relationship, Boy loved Lair, and Lair would request that Boy stay over.

Mom and Boy, then five years old, were riding from daycare on November 25, 2008, when Mom told Boy that he was going to spend the night with Wife and Lair. Boy protested, "Okay, but [Lair] makes me do stuff." When

---

[2]"Boy," "Mom," and "Wife" are fictitious names used in an effort to protect the identity of the child complainant. *See Munoz v. State*, 288 S.W.3d 55, 57, n.2 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

Mom asked Boy what type of things, Boy responded that Lair "makes me touch his privates." Boy explained that Lair would put his "privates" in Boy's mouth and "wiggle it around." Boy described how Lair would "pee in his mouth," and that the "pee" was "sticky." Boy said that this was his and Lair's "secret" and that he was not supposed to tell anyone. Mom inquired whether Lair ever touched Boy in a similar manner, and Boy described that Lair would touch Boy's "privates" and "wiggle them around in his hand." At one point, Mom became emotional, and Boy responded that Lair "only touched my front parts, he didn't touch my back privates." After discussing this outcry with other family members, Mom contacted the police.

Stephanie Nick, a child forensic interviewer, interviewed Boy the next day. Boy told Nick the same things that he had told Mom regarding Lair putting his penis in Boy's mouth and ejaculating. But Boy also described that Lair had put his penis in Boy's anus. According to Nick, Boy "pointed to his front genital area and said that, [Lair] would put that, and then pointed to his bottom." Boy used the term "bottom hole" to explain where Lair had put his penis. By Nick's account, Boy described these acts as "gooey" but not painful. Boy also revealed that he was familiar with Lair's tattoo of a Texas longhorn, which Lair had on his front, lower hip. Pictures of Lair's tattoo were published to the jury. A video of the forensic interview was played for the jury.

Rebecca Sullivan, a sexual assault examiner, examined Boy after the forensic interview. Boy told Sullivan that Lair had put his penis in his mouth and

3

bottom. Sullivan testified that Boy said that Lair had put his penis in Boy's anus and that Boy said that it hurt, but there was no bleeding.

By the time of his trial testimony, February 8, 2012, Boy was eight years old. Boy testified that he and Lair had a "secret" and that Lair would take him to buy candy "if I would do this thing for him." Boy described how he would sleep in the bed with Lair when he would stay overnight, and how the other children and Wife would sleep elsewhere. Boy stated that Lair put "his wiener" in Boy's mouth and that Lair would "pee in [Boy's] mouth, and [Boy] would have to go to the restroom and spit it out." Boy described Lair's "pee" as "green." Boy further testified that Lair "would put his wiener in [Boy's] butt." Boy also stated that Lair would put Boy's penis in Lair's mouth.

A jury found Lair guilty of one count of aggravated sexual assault of a child, by causing Boy's mouth to contact Lair's penis, and one count of indecency with a child, for engaging in sexual contact by touching Boy's genitals. The jury was unable to reach a verdict on a count of sexual assault alleging that Lair caused Boy's anus to contact Lair's penis; thus, a mistrial was declared on that count. After a punishment hearing, the jury sentenced Lair to life imprisonment and a $10,000 fine for the aggravated-sexual-assault-of-a-child count and twenty years' confinement and a $10,000 fine for the indecency-with-a-child count. This appeal followed.

### III. DISCUSSION

#### A.    Testimony of a "Rolling Disclosure."

In his first issue, Lair asserts that the trial court erred by allowing Nick, the child forensic interviewer who interviewed Boy, to express her opinion as to why a child might make a so-called "rolling disclosure." Lair does not challenge Nick's qualifications to testify to what a rolling disclosure is or that one might have occurred in this case; rather, Lair argues that Nick is not qualified to express her opinion regarding "why" a child might make one. Lair claims that the answer to why a child makes a rolling disclosure is a topic reserved to "people in the field of child psychology. Nick had no training in that field." The State argues that the trial court properly admitted Nick's testimony and that Lair offers no support for his position that "only a psychologist could testify about the reasons why a child might give a rolling disclosure." We agree with the State.

#### 1.    Applicable Law and Standard of Review

Rule of evidence 702 allows a witness qualified by knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would assist the trier of fact in understanding or determining a fact issue. *See* Tex. R. Evid. 702. Before admitting expert testimony under Rule 702, the trial court must be satisfied that three requirements are met: (1) the witness qualifies as an expert by reason of her knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert

5

testimony will actually assist the factfinder in deciding the case. *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010), *cert. denied*, ––– U.S. –––, 132 S. Ct. 128 (2011). These requirements are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Id.* (*citing Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006)). Each of these requirements raises distinct questions and issues, and an objection based on one requirement does not preserve error as to another. *Shaw v. State*, 329 S.W.3d 645, 655–56 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). At trial, and now on appeal, Lair challenges Nick's qualification only.

The court of criminal appeals has held that:

> Qualification is a two-step inquiry. A witness must first have a sufficient background in a particular field, and a trial judge must then determine whether that background goes to the matter on which the witness is to give an opinion. The proponent must establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject.

*Davis*, 329 S.W.3d at 813 (citations omitted); *see Vela*, 209 S.W.3d at 131–32. The focus is on the "fit" between the subject matter at issue and the expert's familiarity with it, and not on a comparison of the expert's title or specialty with that of the defendant or competing expert. *Vela*, 209 S.W.3d at 133. Just as the subject matter of an expert's testimony should be tailored to the facts of a case, the expert's background must be tailored to the specific area of expertise in which the expert desires to testify. *Id.*

6

"Because the spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses appropriate qualifications as an expert on a specific topic in a particular case." *Davis*, 329 S.W.3d at 813 (citing *Vela*, 209 S.W.3d at 136). When a trial judge determines that a witness is or is not qualified to testify as an expert, "appellate courts rarely disturb the trial court's determination." *Vela*, 209 S.W.3d at 136 (quoting *Rodgers v. State*, 205 S.W.3d 525, 528 n.9 (Tex. Crim. App. 2006)).

### 2. Nick is Qualified to Testify Why Rolling Disclosures Occur

In this case, Nick explained that a rolling disclosure was the prolonged outcry by a child "where a child will give some information to one person [about an alleged abuse], and then when they're asked by a second person, they may give additional information than they gave to the first person." Over Lair's objection, Nick also averred that "[s]ome of the reasons" a child might disclose abuse in this manner "may be that [the child is] afraid that they're going to get in trouble, so they stop. It may be based on the reaction of the person that they're telling, or they may fear what will happen if they do tell all of the information." Nick explained that based upon her experience, rolling disclosures were commonplace in children's outcries about sexual abuse. And Nick testified to her particular background regarding rolling disclosures.

Nick received her bachelor's degree in social work from the University of Texas at Arlington. She is a licensed social worker. Prior to working as a child forensic interviewer, she worked for roughly five years as an investigator for Child

7

Protective Services. At the time she interviewed Boy, Nick was a child forensic interviewer for The Alliance for Children, which houses a multidisciplinary team for investigations involving child abuse and neglect. She has conducted approximately 1,000 forensic interviews of children. According to Nick, she obtained her knowledge of rolling disclosures through training, seminars, and education that she attended as a child forensic interviewer. She testified that rolling disclosures were discussed at "every" seminar she has attended, and she also explained that she was "taught" about the subject at "the Finding Words training" seminar—a week-long seminar for forensic interviewers. Nick stated that the concept of rolling disclosures is widely accepted in the field of forensic interviewing and that she has testified on the topic before in Texas courts.

Lair does not dispute Nick's familiarity with the subject of rolling disclosures, and at trial Lair stated that he did not object to Nick explaining what one was. Instead, Lair focuses on Nick's "title or specialty," assailing only her lack of a degree in child psychology to explain his position that Nick could not testify as to why a child might outcry through a rolling disclosure. *See Vela*, 209 S.W.3d at 133 (reasoning that a trial court conducts an insufficient inquiry into an expert's qualification when it considers the expert's "title" alone). But Lair has not presented anything to support his bare assertion that rolling disclosures as a subject are the sole province of child psychologists and that licensed and trained forensic interviewers or social workers are per se unqualified to testify regarding this topic. *See Morris v. State*, 361 S.W.3d 649, 666 (Tex. Crim. App. 2011)

8

(discussing "grooming" testimony and explaining that such "evidence has been received by courts from numerous types of experts—which include psychiatrists, psychologists, therapists, []social workers[, and] law enforcement."). We conclude that the State established that Nick has the knowledge, skill, experience, training, and education regarding rolling disclosures that would qualify her to give an opinion on that particular subject. *See Davis*, 329 S.W.3d at 813. Therefore, we hold that the trial court did not abuse its discretion by determining that Nick possessed a sufficient background in the particular subject of rolling disclosures, and that her background went to the matter of what a rolling disclosure is and why one might occur. *See Id.* We overrule Lair's first issue.

## B.    Extraneous Offense Evidence and the State's Notice

In his second issue, Lair argues that the trial court erred by allowing the State to elicit testimony from Wife, during the guilt/innocence phase of trial, in which she described entering the back bedroom where Lair and Boy often slept and discovering both Lair and Boy on the bed in their underwear only; Boy was near Lair's thighs facing Lair; Boy acted surprised; Lair rolled over onto his stomach; and, after a short exchange, Lair told her to "get out." Lair argues that this was extraneous-offense evidence and that the State failed to formally notify him of its intent to introduce this evidence despite his request for such notification.

9

The State responds that this was same-transaction contextual evidence and that it was not required to formally notify Lair of its intent to introduce this testimony. Alternatively, the State argues that Lair was not harmed by the introduction of this evidence. We will assume without deciding that the State was required to notify Lair of its intention to introduce this testimony, but we conclude that Lair has failed to demonstrate how his defense was harmed by the State's alleged failure to provide reasonable notice of its intent to introduce this evidence.

### 1. Applicable Law and Standard of Review

Texas Rules of Evidence Rule 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

Tex. R. Evid. 404(b). The court of criminal appeals has held that a trial court errs by admitting objected-to extraneous offense evidence when the State failed to comply with Rule 404(b)'s notice provisions. *Hernandez v. State*, 176 S.W.3d 821, 822 (Tex. Crim. App. 2005). This is so because "Rule 404(b) literally conditions the admissibility of other-crimes evidence on the State's compliance with the notice provision of Rule 404(b)." *Id.* at 824. And because the notice

10

requirement of Rule 404(b) is a rule of evidence admissibility, the trial court's error of admitting extraneous offense evidence despite the State's failure to properly notify the defendant is subject to a Texas Rules of Appellate Procedure Rule 44.2(b) harm analysis.  *See id.* at 825; *see also* Tex. R. App. P. 44.2(b).

Even so, the harm analysis that a reviewing court is to conduct when the error is that the trial court erroneously admitted evidence despite the State's failure to comply with Rule 404(b)'s notice provisions is unique.  *Hernandez*, 176 S.W.3d at 825.  In *Hernandez*, the court clarified that rather than conduct "the usual harm analysis applied to the improper admission of evidence," a reviewing court's harm analysis begotten by the State's non-compliance with the notice requirements of 404(b) revolves around the question of whether a defendant was unable to prepare his defense in a particular case.  *Id.*  That is, we consider how the lack of notice harmed the defendant's ability to prepare a defense to the wrongfully admitted evidence and not whether the admitted evidence injured the jury's verdict.  *Id.*; *Padilla v. State*, 254 S.W.3d 585, 593 (Tex. App.—Eastland 2008, pet. ref'd).

Factors that reviewing courts have considered in analyzing this specific type of harm include:  whether the defendant was surprised by the evidence, *Hernandez*, 176 S.W.3d at 822–23; whether the admission of the evidence was the result of prosecutorial bad faith, *Roethel v. State*, 80 S.W.3d 276, 282 (Tex. App.—Austin 2002, no pet.); whether the defendant was unable to prepare cross-examination or present mitigating evidence, *McDonald v. State*, 179 S.W.3d 571,

11

578 (Tex. Crim. App. 2005); whether the defendant moved for a continuance so that he might defend against the evidence, *Webb v. State*, 36 S.W.3d 164, 183 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (en banc); and whether the defendant has demonstrated how his defensive strategy might have been different had the State explicitly notified him of its intention to introduce the evidence. *Hernandez*, 176 S.W.3d at 823.

## 2. Lair's Defense was not Harmed by Wife's Testimony

Here, "it strains credulity to think that [Lair] was not on notice that the State intended to use" the complained-of testimony. *Id.* at 826. Not only was Lair not surprised by the testimony, he objected to the precise nature and content of Wife's testimony[3] after she was sworn in but before she was ever called and questioned.

In a hearing that followed his objection, Lair admitted to the trial court that he first learned of the content and nature of Wife's testimony through the State's open file policy, which included Wife's witness statement, before he filed his requests for notice of the State's intentions to admit extraneous-offense

---

[3]On the second day of trial and prior to the jury being seated, Lair objected: "Yes, Judge. The State is intending to call [Wife] to the stand. That's the witness that you just swore in. Obviously, I don't know all the topics that the State intends to cover with [Wife], but I am aware of an extraneous offense that the witness might be asked about, and I can only ask the prosecutor if they intend to go into the time that [Wife] alleges that she walked into the room -- to the bedroom, and my client, [] Lair, was in the bed with [Boy], the alleged victim, and they were both in their underwear." From there, the trial court conducted a hearing that consumed more than twenty pages of the record—ultimately ruling the testimony admissible and seating the jury.

evidence. Lair also agreed with the State's contention that he had discussed the topic of Wife's testimony with the prosecutor "on multiple occasions." Wife was listed as a "potential witness" on all three of the State's filed witness lists. Furthermore, Lair had interviewed Wife multiple times over a three-year period leading up to trial. The record belies any notion that Lair was surprised by the evidence. *See id.* at 823. Additionally, Lair was prepared to and did cross-examine Wife about the incident in question and attempted to mitigate her testimony. *See McDonald*, 179 S.W.3d at 578–79. Lair elicited testimony that both Lair and Boy appeared to be watching television in the room when she walked in, that Wife saw nothing illegal transpire between Lair and Boy, and that Wife did not call the police or report the incident to Child Protective Services.

On appeal, Lair makes no argument that the lack of notice prejudiced his ability to prepare or present a defense to this evidence.[4] *See Hernandez*, 176 S.W.3d at 822–23. And although at trial Lair claimed during the 404(b) hearing that he would have conducted his voir dire differently or modified his opening statements to defend against this evidence had he received formal notice from the State, we conclude, as other courts have, that when the evidence is known

---

[4]In his briefing to this court, Lair cites traditional harm analysis rules regarding the improper admission of substantively inadmissible evidence and argues that we "should not conclude that this evidence had no bearing on the verdict." *See Solomon v. State*, 49 S.W.3d 356, 364 (Tex. Crim. App. 2001). But the harm analysis conducted in cases where the State fails to comply with Rule 404(b)'s notice provision concerning "substantively admissible Rule 404(b) evidence" is governed by the harm standard articulated in *Hernandez*. 176 S.W.3d at 825.

well before trial, these types of claims are not a demonstration of how a defensive strategy was affected by the lack of formal notice and do not demonstrate harm. *See Hernandez,* 176 S.W.3d at 823 ("Surely, having been given the complete tape recordings [months before his 404(b) notice request], appellant's counsel listened to them and thus was in a position to develop evidence to mitigate their impact."); *see also Hopson v. State*, No. 09-06-00088-CR, 2007 WL 1793873, at *2 (Tex. App.—Beaumont, June 20, 2007, no pet.) (mem. op; not designated for publication) (overruling appellant's argument that had he received formal notice of the State's intent to introduce the complained-of evidence, he "could have questioned the jury about the matter during jury selection" when reference to the complained-of extraneous offense was in a recorded statement produced in discovery well before trial.).

Furthermore, Lair makes no claims of, and there is no evidence in the record of, prosecutorial bad faith; rather, the State has consistently maintained that it considered the complained-of testimony as same-transaction contextual evidence and did not think it was required to notify Lair, and Lair did not dispute at trial the State's claim that it had discussed this specific testimony with Lair "on multiple occasions" prior to trial. *See Roethel*, 80 S.W.3d at 282. Finally, Lair did not move for a continuance so that he might defend against the evidence. To the contrary, and as discussed above, the record indicates that he was well-prepared to cross-examine Wife about the incident and that he lodged a very precise objection to her testimony regarding the incident before the State ever

14

questioned her on direct examination. *See Webb*, 36 S.W.3d at 183. We hold that Lair has failed to demonstrate how his defensive strategy might have been different had the State explicitly notified him of its intention to introduce the complained-of evidence; thus, Lair was not harmed by its admission. *See Hernandez*, 176 S.W.3d at 823. We overrule Lair's second issue.

### C.    Lair's Motions for Mistrial

In his third issue, Lair argues that the trial court abused its discretion by denying his motions for a mistrial after he twice, in almost rapid succession, objected to the State's closing argument and the trial court sustained his objections. After both objections, Lair asked the trial court to instruct the jury to disregard the State's argument, which the trial court did. Lair also moved for a mistrial after both instructions, and the trial court denied the motions for mistrial. Lair argues that the State's closing arguments asking the jury, "Do you want [Lair] to baby-sit your child?" followed shortly by "Why wouldn't you want your kid to be around [Lair]?" improperly asked the jury to place themselves in the shoes of the complainant and his family. Lair argues that the State's statements "affected the substantive rights of [Lair]" and that this court should "reverse his conviction."

The State argues that the arguments in question were not improper, and in the alternative, the State argues that the trial court did not abuse its discretion by overruling Lair's motions for mistrial because it promptly sustained Lair's objections and instructed the jury to disregard the statements. We will assume

15

without deciding that the statements made by the State were improper, but we conclude that the trial court did not abuse its discretion by overruling Lair's motions for mistrial.

### 1.    Standard of Review and Applicable Law

Almost any improper argument may be cured by an instruction to disregard.  *Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim. App.), *cert. denied*, 516 U.S. 832 (1995).  And when the trial court sustains an objection and instructs the jury to disregard but denies a motion for mistrial, the issue is whether the trial court abused its discretion by denying the mistrial.  *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004).  A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile.  *Hawkins*, 135 S.W.3d at 77.

The question of whether a mistrial should have been granted when a curative instruction has been given involves most, if not all, of the same considerations that attend a harm analysis.  *Id.*  Therefore, in cases in which constitutional rights are not implicated, courts employ a three-factored analysis which seeks to evaluate the effect of the harm on the outcome of the trial.  *See id.*; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998); *Tucker v. State*, 15 S.W.3d 229, 237–38 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).  The factors to be considered in determining whether the trial court abused its discretion by denying a mistrial include:  (1) the severity of the misconduct (magnitude of the prejudicial effect); (2) measures adopted to cure the

misconduct (efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct. *See Hawkins*, 135 S.W.3d at 77 (applying the three-factor test to improper arguments during the punishment phase); *Mosley*, 983 S.W.2d at 259; *Tucker*, 15 S.W.3d at 237–38 (analyzing the three factors to determine if improper argument during guilt/innocence phase constituted reversal). We do not conclude that any constitutional rights were impinged upon by the prosecutor's remarks in this case, and Lair does not contend that constitutional rights are implicated. *See Tucker*, 15 S.W.3d at 237 (holding the trial court's erroneous ruling regarding improper comments made during jury argument involved non-constitutional error); *Ortiz v. State*, 999 S.W.2d 600, 605–06 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding that trial court's error in overruling the appellant's repeated objections to arguments outside the record constituted non-constitutional error). We will therefore utilize the *Mosley* factors to determine if a mistrial should have been granted.

### 2. Analysis

With respect to the first factor, we do not find the State's alleged improper arguments severe enough to warrant a mistrial or a reversal of Lair's convictions. *See Brandley v. State*, 691 S.W.2d 699, 712 (Tex. Crim. App. 1985) (holding that the prosecutor asking the jurors during the punishment phase of the trial to place themselves in the shoes of the child victim's father was harmless error); *Bible v. State*, No. 10-10-00070-CR, 2011 WL 1902021, at *9 (Tex. App.—Waco May 11,

17

2011, pet. ref'd) (holding that even though the trial court erroneously overruled defendant's objection to the State's improper plea to the jury to place themselves in the shoes of the victim, made during the guilt/innocence phase, such error "was not great"); *see also Geuder v. State*, 76 S.W.3d 133, 138 (Tex. App.—Houston [14th Dist.] 2002), *overruled on other grounds by*, 115 S.W.3d 11 (Tex. Crim. App. 2003) (concluding that a mistrial was not necessary despite the statement "who knows how many other people [defendant] has stolen from in other counties" by the prosecutor during the guilt/innocence phase).

Second, we conclude the curative measure employed by the trial court in this case to disregard the prosecutor's statements sufficient to effectively cure any alleged harm. Lair does not point to anything in the record leading us to conclude that the jury did not or could not obey the trial court's instructions, and we are to presume that the jury followed the instructions. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (reasoning that a reviewing court generally considers instructions given to the jury to be sufficient to remedy most improprieties that occur during a trial and presumes that a jury will follow the trial court's instructions).

Last, we conclude that Lair's conviction was fairly certain, regardless of the prosecutor's alleged improper remarks. Boy testified that on more than one occasion at night while in Lair's bed, both his and Lair's clothes "were off" and that Lair would put his penis in Boy's mouth and then "pee" in Boy's mouth. Boy also testified that Lair would put Boy's penis in Lair's mouth. This testimony was

18

consistent with the testimony by Mother and the forensic interviewer, who both also testified that Boy had described the "pee" to them as "sticky" or "gooey." The jury also heard testimony from Boy and Mother that Lair would buy Boy "special" gifts. Specifically, Boy testified that Lair had told him that these acts were their "secret" and that if Boy would perform these acts, Lair "would go take [Boy] to get candy." The jury also heard testimony that Boy would sleep alone with Lair, that Wife would sleep on the couch, that Lair and Wife did not have a normal marital relationship, and that Boy would often shower with Lair.

Accordingly, we hold that the trial court did not abuse its discretion by finding that the prosecutor's alleged improper comments to the jury were not so prejudicial that expenditures of further time and expense would be wasteful, futile, and demanding of a mistrial. *See Newby v. State*, 252 S.W.3d 431, 437–38 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (holding that prosecutor's statement to jury, "If you think that [defendant] is not guilty, I want each of you to be able to walk out of this courtroom, right by [victim], and say [to victim], I don't believe a word you said, because that's what you have to do," did not warrant mistrial, in prosecution for sexual assault of a child, and that trial court's curative measure of "[j]ury is instructed to disregard" was sufficient). We overrule Lair's third issue.

## IV. CONCLUSION

Having overruled all three of Lair's issues, we affirm the trial court's judgments.

BILL MEIER
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MEIER, JJ.

WALKER, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 8, 2013