**Opinion issued December 15, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00507-CR

————————————

**ROBERT THOMAS WILHARM, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case No. 1402605**

---

## MEMORANDUM OPINION

Robert Wilharm was convicted of assault of a person with whom he had a dating relationship, N. Zepeda, and sentenced to 20 years' confinement. Wilharm argues that the trial court erred by (1) refusing to grant his request for a ten-day extension after it allowed the State to correct the spelling of Zepeda's name in the

indictment, (2) halting his cross-examination of Zepeda, (3) admitting a police officer's testimony about Zepeda's statements to him during his investigation, (4) allowing the State to impeach one of his several character witnesses with certain prior offenses, and (5) allowing a police officer to testify that redness in Zepeda's eye could have been caused by asphyxiation. We affirm.

**Background**

Wilharm and Zepeda met at a bar, then dated "for a short time." They began communicating regularly via text message and phone calls. Zepeda testified that Wilharm's messages became "very strange," she became "fed up" with his messages and "the situation," and she asked him over to her apartment one evening to "end a relationship that was not coming to anything."

When Wilharm arrived at Zepeda's apartment, Wilharm tried to initiate sex with her three times, by verbal statements and by trying to remove her clothing. Zepeda testified that she declined his advances and that they did not have sex. They watched TV together and fell asleep on separate couches. She further testified that Wilharm woke her around 5:00 a.m. He was standing in front of her face, naked, and rubbing his genitals on her face, "intending to have sex." Zepeda testified that she told him that she "didn't want anything and for him to . . . get dressed and leave" her apartment. Wilharm refused to do so, instead laughing and insulting her. Zepeda threatened to call the police.

2

Zepeda testified that Wilharm then "came up from behind [Zepeda] and grabbed the phone from [her]," and then "grabbed [her] hair and slammed [her] on the floor." He continued slamming her "against the floor until he busted [her] lip." He grabbed her by the neck and "tried to choke [her] with his hand several times." Wilharm threatened that Zepeda was "going to die" that day, grabbed her arm and threatened to break it, and then began choking her again. When he covered her mouth with his hand, she "bit him very hard." During these events, which Zepeda testified lasted a total of about 30 minutes, she screamed repeatedly for Wilharm to "stop" and stated that he was hurting her. At some point, she found it impossible to breathe and briefly lost consciousness.

Wilharm called emergency services. Throughout the 9-1-1 call, a recording of which was played in evidence at trial, Zepeda can be heard screaming in the background. Zepeda testified that she was screaming "[f]or him to leave [her] alone" and "to stop jumping because he was jumping on [her] back." She further testified that the physical assault continued throughout the entire call and stopped only when police arrived. Wilharm, meanwhile, can be heard in the recording telling the emergency dispatcher that Zepeda—whose first name he misspelled for the dispatcher—tried to kill him, "almost bit [his] thumb off," and "tried to gouge [his] eyes out." He also stated that he was holding Zepeda down during the call because "she tried to kill me just now." He told the dispatcher that Zepeda has

3

borderline personality disorder. Zepeda testified that she does not have that disorder or "any form of manic or depression or anything like that."

After the police arrived, Officers M. Leal and R. Still of the Houston Police Department spoke with both Zepeda and Wilharm. Wilharm told the police that he and Zepeda had slept on the bed together and that, when he woke up, Zepeda attacked him. According to Wilharm, Zepeda's injuries resulted from Wilharm defending himself and restraining her. Zepeda, however, gave both written and oral statements and told the police that Wilharm had attacked her. The police arrested Wilharm.

## A.   Indictment

A grand jury indicted Wilharm for "intentionally and knowingly caus[ing] bodily injury to [N.] Zepeda . . . a person with whom [he] had a dating relationship, by impeding [her] normal breathing or circulation of the blood . . . by applying pressure to [her] throat, applying pressure to [her] neck and blocking [her] mouth." The indictment also alleged in an enhancement paragraph that Wilharm had previously been convicted of assault against a member of his family.

Before voir dire, the State moved to amend the indictment to correct the spelling of Zepeda's first name. Both Zepeda and Officer Leal testified that the original spelling, which matched the spelling Wilharm had given to the dispatcher, was the English spelling of Zepeda's first name, but the correct spelling was the

Spanish spelling. The trial court granted the State's motion to amend the indictment over Wilharm's objection, without granting Wilharm 10 days to respond to the amended indictment. *See* TEX. CODE CRIM. PROC. art. 28.10 (after amendment to indictment and upon request by defendant, trial court must allow not less than 10 days, or shorter period if requested by defendant, to respond to amended indictment).

## B.    Trial

Zepeda, who speaks English but is more comfortable speaking Spanish, testified through an interpreter about her relationship with Wilharm, the altercation, and the substance of her statements that can be heard in the background of the 9-1-1 recording. She also testified that she "never gave [Wilharm] a last name" and that Wilharm told her his name was "Rob W."

During cross-examination, Zepeda initially refused to answer questions about the timing and content of text messages she sent to and received from Wilharm. She repeatedly stated that she could not answer the questions without more context, that "there's a lot missing" in the exhibits she was shown, and that she would not answer questions without seeing messages previous to those introduced into evidence. Specifically, she answered, "I'm sorry, but if you don't show me the prior messages, I'm not going to answer," at which point the prosecutor asked to "have a moment with [the] witness in the hallway." The trial

5

court granted the State's request, over Wilharm's objection, after which Zepeda answered questions from Wilharm's counsel about the text messages and an interspersed series of phone calls to and from Wilharm.

Officers Leal and Still testified about their response to Wilharm's 9-1-1 call. Wilharm objected to several of Leal's statements in which he repeated what Zepeda had told the officers during the investigation, but Wilharm did not object when Still or Zepeda testified about many of those same statements. Additionally, Wilharm objected to Leal's testimony that redness in Zepeda's eye could have been caused by asphyxiation as improper expert testimony but again did not object when Leal offered other opinions about symptoms of asphyxiation or when Still offered the same opinion. The trial court overruled these objections.

Wilharm offered the testimony of three witnesses who testified that Zepeda had a reputation for lying and for violence. After Richard Aguirre, one of these witnesses, implied that his only past criminal history was "an assault charge when [he] was young," the State impeached him by eliciting testimony regarding several additional prior convictions, including misdemeanor convictions from more than ten years before trial. Wilharm objected to some but not all of these questions on the ground that several questions constituted "improper impeachment," but the trial court overruled those objections.

The jury found Wilharm guilty of assault of a person with whom he had a dating relationship and sentenced him to 20 years' confinement. Wilharm appeals his conviction.

**Extension After Amendment of Indictment**

In his first issue, Wilharm argues that the trial court erred in refusing to grant a ten-day extension after the State amended the indictment to correct the spelling of Zepeda's first name. "After notice to the defendant, a matter of form or substance in an indictment or information may be amended at any time before the date the trial on the merits commences." TEX. CODE CRIM. PROC. art. 28.10. But "[o]n the request of the defendant, the court shall allow the defendant not less than 10 days, or a shorter period if requested by the defendant, to respond to the amended indictment or information." *Id.* The trial court refused Wilharm's request for time to respond after the State's amendment, which Wilharm contends requires us to reverse the conviction.

**A.     Standard of review**

We will only overturn a conviction based on the trial court's refusal to grant a defendant time to respond to the amended indictment if the error was harmful, that is, if it "affected his substantial rights." TEX. R. APP. P. 44.2(b); *Hamann v. State*, 428 S.W.3d 221, 225 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *Richard v. State*, No. 01-11-00945-CR, 2013 WL 4676129, at *4–5 (Tex. App.—

7

Houston [1st Dist.] Aug. 27, 2013, no pet.) (mem. op., not designated for publication); *see Hall v. State*, 62 S.W.3d 918, 919–20 (Tex. App.—Dallas 2001, pet. ref'd) (holding that removal of surplus language from indictment is not "amendment" under Section 28.10); *Hicks v. State*, 864 S.W.2d 693, 694 (Tex. App.—Houston [14th Dist.] 1993, no pet.) (same). "If, looking at the record as a whole, it appears the error 'did not influence the jury, or had but a slight effect,' we must consider the error harmless and allow the conviction to stand." *Hamann*, 428 S.W.3d at 226 (quoting *Trejos v. State*, 243 S.W.3d 30, 41–42 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd)).

## B.    Analysis

Before voir dire, the trial court granted the State's motion to amend the indictment to correct the spelling of Zepeda's first name. The original indictment used an incorrect, English spelling of Zepeda's name. The State amended the indictment to change the spelling to the correct, Spanish spelling of her name. Wilharm argues that the "trial court erred in failing to grant [him] a ten-day extension" as required by Article 28.10 of the Code of Criminal Procedure after it amended the indictment. *See* TEX. CODE CRIM. PROC. art. 28.10.

Wilharm does not argue that the change in spelling harmed him or hurt his ability to prepare a defense or impeach Zepeda. Wilharm did, in fact, impeach Zepeda with the information he received about the different spellings of her name,

8

arguing that Zepeda gave the wrong spelling to the police intentionally. He used this exchange to impeach Zepeda's character for truthfulness. Notably, the misspelling of Zepeda's name did not prohibit Wilharm from learning of her criminal history. Rather, the State disclosed Zepeda's criminal history to Wilharm in its pre-trial *Brady* notice. Nor does Wilharm argue that the spelling change influenced the jury at all. Thus, neither Wilharm's briefing nor our review of the record as a whole reveals any harm requiring reversal. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997); *Hamann*, 428 S.W.3d at 226.

Because Wilharm has failed to demonstrate that the trial court's refusal to grant a ten-day extension after the State amended the indictment harmed him, we overrule his first issue.

### Interruption of Cross-Examination

In his second issue, Wilharm argues that the trial court erred in halting cross-examination of Zepeda and granting the prosecution a recess to confer with the witness. The entirety of his argument is as follows:

> The trial court must make the interrogation of the witnesses conducive to the ascertainment of the truth. TEX. R. EVID. 611. The trial court allowed the State to stop appellant's cross examination in order to confer with the complaining witness outside the presence of the jury over appellant's objection. (RR III 74–75). The following exchange occurred between the trial court and counsel:

> [quoted exchange]

9

> This improper interruption of appellant's right to cross examination and coaching outside the presence of the jury violates appellant's right to due process. U.S. CONST. V. The trial court erred in allowing this to happen.

Rule of Appellate Procedure 38.1(i) requires an appellant's brief to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). If a party fails to provide citations or arguments for his position, the party waives that argument for purposes of appellate review. *Gallo v. State*, 239 S.W.3d 757, 768 (Tex. Crim. App. 2007); *State v. Gonzalez*, 855 S.W.2d 692, 697 (Tex. Crim. App. 1993); *see Grado v. State*, 445 S.W.3d 736, 738–39 (Tex. Crim. App. 2014) (in general, even constitutional errors may be waived or forfeited).

Wilharm did not provide any citation or reasoning to support his argument that the State's request to pause cross-examination to "have a moment" with Zepeda was a violation of his right to due process. He does not identify—nor can we locate—any authority for the proposition that a pause in cross-examination violates a defendant's due-process rights. Nor does he distinguish this interruption from routine interruptions of cross-examination, such as those caused by court recesses, or identify any evidence regarding the substance of the alleged "coaching" of the witness.

Wilharm has waived his second issue by inadequate briefing. Even if he had preserved it, we would be compelled to overrule it, as he was allowed to conduct

further cross-examination after the interruption, and he makes no effort to show that the interruption contributed to his conviction or affected any substantial right. *See* TEX. R. APP. P. 44.2(a), (b); *King*, 953 S.W.2d at 271; *Hamann*, 428 S.W.3d at 225; *Richard*, 2013 WL 4676129, at *4–5.

**Challenges to Testimony Admitted at Trial**

In his remaining three issues, Wilharm argues that the trial court improperly admitted three categories of testimony: testimony regarding hearsay, cross-examination about a witness's prior convictions, and testimony concerning the condition of Zepeda's eye.

## A.     Standard of review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006). A trial court commits an abuse of discretion when its decision falls outside the zone of reasonable disagreement. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)); *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). Before a reviewing court may reverse the trial court's decision, "it must find the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable

11

people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008).

To preserve a complaint for appellate review, the complaint must be made to the trial court by a timely request, objection, or motion that makes the trial court aware of the complaint, and the record must show that the trial court ruled on the request, objection, or motion, or refused to do so. TEX. R. APP. P. 33.1; *Bekendam v. State*, 441 S.W.3d 295, 299–300 (Tex. Crim. App. 2014).

## B.    Analysis

### 1.    Hearsay testimony

In his third issue, Wilharm argues that the trial court improper allowed Officer Leal to testify regarding facts that he learned from another officer, over Wilharm's objections that the testimony constituted inadmissible hearsay.

Hearsay is an out-of-court statement that "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the statement." TEX. R. EVID. 801(d). Hearsay is generally inadmissible, unless allowed by a specific evidentiary rule. TEX. R. EVID. 802.

The erroneous admission of a hearsay statement constitutes non-constitutional error that is subject to a harm analysis. *Campos v. State*, 317 S.W.3d 768, 779 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). We disregard non-

constitutional errors that do not affect the substantial rights of the defendant. *See* TEX. R. APP. P. 44.2(b); *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). "[S]ubstantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'" *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001)); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

Wilharm's briefing on this issue consists of nearly four pages of quoted testimony, objections, and rulings by the trial court, followed by the bare assertions that "[n]o statute, rule of evidence or exception to the hearsay rule allows for Officer Leal to relate the facts he was told by Officer Still to the jury," and that the "trial court erred in admitting this evidence and abused its discretion in so doing." In the quoted testimony, Officer Leal testified that Officer Still had called his attention to the fact that one half of Zepeda's bed had been slept in, while the other half appeared "turned down" and "fresh." He then testified regarding Zepeda's statements to Officer Still about her sleeping habits, the placement of her phone charger relative to her bed, and events on the evening of the assault. On cross-examination, he confirmed that Officer Still was the source of "the things [he] learned in the course of this investigation."

Wilharm does not identify with any specificity statements that were not admissible, nor does he argue that the admission of any challenged testimony harmed him or resulted in an improper verdict. *See* TEX. R. APP. P. 44.2(b); *Johnson*, 43 S.W.3d at 4; *Campos*, 317 S.W.3d at 779. We hold that he has waived his third issue by inadequately briefing it. *See Gallo*, 239 S.W.3d at 768; *Gonzalez*, 855 S.W.2d at 697. Even if he had adequately briefed the issue, we would overrule it, as our review of the record reveals no statements that could have had more than a slight effect on the jury and were not admitted elsewhere without objection. *See Motilla*, 78 S.W.3d at 355.

### 2. Testimony regarding witness's prior convictions

In his fourth issue, Wilharm argues that the trial court erred in allowing the State to ask Richard Aguirre, one of Wilharm's witnesses who testified about Zepeda's character, about the witness's past convictions more than ten years earlier, including (1) a 2001 conviction for assault with a deadly weapon, (2) a 2000 DWI conviction, and (3) a 1998 conviction for possession of a controlled substance.

The ten-year limitation on the use of a criminal conviction to impeach a witness is set forth in Texas Rule of Evidence 609, which provides, in relevant part,

> (a)    Evidence of a criminal conviction offered to attack a witness's character for truthfulness must be admitted if

> (1) the crime was a felony or involved moral turpitude, regardless of punishment;
>
> (2) the probative value of the evidence outweighs its prejudicial effect to a party; and
>
> (3) it is elicited from the witness or established by public record.
>
> (b) This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect.

TEX. R. EVID. 609(a)–(b).

Aguirre testified on direct examination that Zepeda is "not very truthful at all," but "is very violent" and has "been violent several times." On cross-examination by the State, he testified, without objection, that he had a criminal history. When the prosecutor asked him to "please tell [us] about it," Aguirre responded, "I had an assault charge when I was young," specifically when he was 20 years old. The prosecutor then asked, "You have another assault, right?" Aguirre testified that he did, prompting an unspecified objection by Wilharm, which was withdrawn without obtaining a ruling. The prosecutor then asked, "Mr. Aguirre, isn't it true that back in May of 2001[—which was when he was 16 or 17 years old—] you were convicted of assault in Williamson County and you received 40 days in the county jail?" Wilharm objected, "This conviction is inadmissible. And it's improper impeachment despite the way the State is doing this, Your

Honor." After the objection was overruled, Aguirre acknowledged the conviction. The prosecutor then asked, without objection, about a 2003 conviction for aggravated assault with a deadly weapon. Wilharm objected to questions about a 2000 DWI conviction and a 1998 conviction for possession of a controlled substance, stating that those questions were "improper impeachment" and "inadmissible," citing Rules of Evidence 403 and 404.

Wilharm objected to the testimony regarding the 2001 assault, stating, in part, "This conviction is inadmissible," but without offering any reasoning for that assertion or referring to any rule of evidence. And Wilharm had not objected to the question that led to Aguirre's immediately preceding statement that he had been convicted of assault on another occasion, that is, an occasion other than the one "when [he] was young." Indeed, the State responded to Wilharm's eventual objection, "Your Honor, when I asked the witness if he had a prior conviction, he brought it up himself." Nothing in Wilharm's other objections made clear to the trial court that the basis for the objections was improper use of a prior conviction under Rule 609(b); instead, he relied entirely on Rules 403 and 404. Thus, Wilharm's complaint on appeal does not comport with his objections in the trial court and is therefore not preserved for our review. *See* TEX. R. APP. P. 33.1; *Bekendam*, 441 S.W.3d at 300.

Finally, any error in admitting evidence of a witness's prior convictions is subject to a harm analysis. *Johnson*, 43 S.W.3d at 4; *Jabari v. State*, 273 S.W.3d 745, 754 (Tex. App.—Houston [1st Dist.] 2008, no pet.). But Wilharm has not argued that he was harmed by the admission of evidence regarding certain of Aguirre's prior convictions. We also note that two other witnesses—in addition to Aguirre—testified that Zepeda was dishonest and violent. Thus, Aguirre's testimony regarding Zepeda's character was merely cumulative of other evidence, and Wilharm has made no attempt to show that he was harmed by evidence tending to discredit Aguirre alone.

Given the record before us, Wilharm has not preserved his complaint for our review. Further, any error in admitting evidence of Aguirre's prior convictions was harmless, as Aguirre's testimony regarding Zepeda's character for honesty and violence was cumulative of testimony by other witnesses.

We overrule Wilharm's fourth issue.

### 3. Testimony regarding Zepeda's eye

Finally, in his fifth issue, Wilharm argues that Officer Leal "was a probationary officer with only 9 months of experience" and therefore should not have been allowed to testify about Zepeda's injuries. Specifically, Wilharm points to the following testimony:

Q. Okay. And what kind of injuries did she suffer?

17

A. She suffered trauma to the head, there were fresh welts on there when she started speaking to her. She had a bloody lip. She had red eyes, bloodshot eyes with portions that had -- I guess capillaries had burst or something, but there were big blotches of red in her eye.

. . . .

Q. In your training and experience when somebody has their capillaries burst, what is that consistent with?

A. Asphyxiation.

Although Wilharm objected to the question about burst capillaries, he did not object when Zepeda herself testified earlier in the trial that "[t]he vessels in [her] eye burst" as a result of her struggle with Wilharm. Wilharm also did not object to Leal's testimony regarding mechanisms of asphyxiation or his observation of other symptoms that he identified as consistent with asphyxiation, including marks on Zepeda's neck, a cut on her chin, swelling, and bruising. Leal also testified without objection about photographic evidence, including a photograph of the burst capillaries in Zepeda's eye and another of injuries to Wilharm's thumb, which Leal testified were consistent with Zepeda's claim that Wilharm put his hand over her mouth. On appeal, Wilharm argues that Officer Leal's testimony regarding burst capillaries was inadmissible, either as lay witness testimony or as expert testimony.

Admissibility of expert testimony is governed by Rule of Evidence 702. Rule 702 allows an expert "qualified . . . by knowledge, skill, experience, training, or education" to give an expert opinion if "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a

18

fact in issue." TEX. R. EVID. 702. Because "[t]here is no hard and fast rule as to the extent of knowledge required to qualify a witness as an expert in a given field," the decision on whether to qualify a witness as an expert "is generally left to the sound discretion of the trial court." *Austin v. State*, 794 S.W.2d 408, 411 (Tex. App.—Austin 1990, pet. ref'd). But before the trial court allows a witness to give an expert opinion, it must ensure that three conditions are met: "(1) that the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) that the subject matter of the testimony is appropriate for expert testimony; and (3) that admitting the expert testimony will actually assist the fact finder in deciding the case." *Dixon v. State*, 244 S.W.3d 472, 478 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). Wilharm argues only that the first condition is not met.

A witness qualifies as an expert based on his "specialized knowledge" in a particular field, which "may be derived from specialized education, practical experience, a study of technical works, or a varying combination of these things." *Id.* at 479. A police officer's training and experience can be "specialized knowledge" that qualifies the officer as an expert. *See, e.g.*, *Emerson v. State*, 880 S.W.2d 759, 762 (Tex. Crim. App. 1994) (three and one-half years of experience and training in detection of intoxicated persons qualified officer as expert on HGN test performance); *Dixon*, 244 S.W.3d at 479 (training from police department on

19

family violence and observation of "common trend" among domestic violence victims qualified officer as expert on behavior of victims of family violence).

The Court of Criminal Appeals has looked to the Texas Supreme Court "for additional guidance" on determining whether an expert meets the qualification prong of the expert test. *See Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). That prong requires a "two-step inquiry": first, whether the witness has "a sufficient background in a particular field" and second, "whether that background goes to the very matter on which the witness is to give an opinion." *Id.* (internal quotation marks and brackets omitted).

The trial court can consider the witness's "education, training, or experience" in determining whether the first prong is satisfied. *Rodgers v. State*, 205 S.W.3d 525, 528 (Tex. Crim. App. 2006). The degree of education, training, or experience that is required for a witness to be qualified as an expert depends on several factors, including "the complexity of the field about which he proposes to testify"; the conclusiveness of the expert's opinion; and how dispositive the expert's testimony is to the central issues of the lawsuit. *Id.* A higher level of qualification is required for a technical subject "when the evidence is well outside the jury's own experience," while a lower level of qualification is necessary if the expert's opinion "is close to the jury's common understanding." *Id.*

Leal testified that he had served as a police officer for almost three years when he offered his expert opinion at trial. Before observing Zepeda's injuries, he had training at the police academy on "what we're looking for" to detect "a choke-hold or losing oxygen to the brain, being choked out, anything having to do with airway obstruction." He further testified that, in his role as a police officer, he had spoken to other people who reported being choked and likewise had burst capillaries in their eyes. By failing to object to this testimony, Wilharm waived any objections to Leal's testimony about asphyxiation in general or symptoms of asphyxiation other than burst capillaries. *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("To preserve error in admitting evidence . . . . a party must object each time the inadmissible evidence is offered or obtain a running objection." (footnotes omitted)).

We also conclude that, based on Leal's "specialized education" and "practical experience," the trial court did not err in allowing him to give an expert opinion that burst capillaries in Zepeda's eye were "consistent" with asphyxiation. *See Dixon*, 244 S.W.3d at 479. We also note that Wilharm has failed to cite to statutes, rules, or case law or provide any argument—beside his one sentence conclusory statement that "[a]s a probationary officer with only nine months of experience, Officer Leal cannot be qualified as an expert, particularly in regards to medical diagnosis and causation"—as to why Leal's training and three years of

21

experience do not constitute sufficient education or experience to allow him to offer an expert opinion on this particular issue. The evidence at trial demonstrated that Officer Leal had sufficient experience and training to qualify as an expert for the purpose of testifying as to his understanding of the link between asphyxiation and burst capillaries in Zepeda's eye. Further, any error in the trial court's admission of testimony specifically linking burst capillaries in Zepeda's eyes to asphyxiation was cured when Leal offered testimony linking burst capillaries to asphyxiation in general, to which Wilharm did not object. *Valle*, 109 S.W.3d at 509. Accordingly, we hold that the trial court did not err in admitting that testimony. We overrule Wilharm's fifth issue.

## Conclusion

We affirm the judgment of the trial court.

Harvey Brown
Justice

Panel consists of Justices Jennings, Keyes, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).