

| VICENTE CUELLAR, | § | No. 08-18-00133-CR |
| Appellant, | § | Appeal from the |
| v. | § | 171st District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (20160D04843) |

## **O P I N I O N**

Appellant, Vicente Cuellar, appeals his conviction of capital murder of multiple persons. TEX.PENAL CODE ANN. § 19.03(a)(7). In three issues, Appellant asserts trial court error and seeks reversal. In Issue One, Appellant claims he was harmed by the trial court's admission of certain evidence. In Issue Two, Appellant asserts charge error for the trial court's alleged improper comment on the weight of the evidence. Last, Appellant challenges the legal sufficiency of the evidence to support his conviction. We affirm.

### BACKGROUND

### *Factual Background*

Firefighters responded to a desert "brush fire" reported at San Felipe Park in Fabens, Texas on the evening of December 7, 2015. Upon arrival, firefighters saw a vehicle on fire and dispatched the Sheriff's Office for assistance. Sheriffs soon after arrived, and the firefighters escorted the officers to the burning vehicle, all while being cautious not to disturb the footprints they had

previously seen around the vehicle. As the officers and firefighters neared the vehicle, they noticed what appeared to be ribs located inside the vehicle. The fire was eventually extinguished, and the burnt remains of who was later identified as Maria Cuellar ("Maria") were found inside the vehicle. An autopsy report revealed Maria had suffered a fatal bullet wound to the chest before being set on fire.

About an hour earlier, a pecan farmer who lived outside of Fabens and Clint, Texas, A.R. Miller ("Mr. Miller") heard ten-fifteen gunshots at around 6:30 p.m. A phone call was then exchanged between Mr. Miller and Armando Guerrero ("Mr. Guerrero"), Mr. Miller's neighbor from across the railroad track, who confirmed he had also heard the gunshots and saw the brake lights of a truck pulling out from a distance. The next morning, Mr. Miller drove along the canal bank near his property looking for pecan thieves and saw a parked white truck. As he approached, he saw a pool of blood on the ground, and the body of David Miranda ("David"), a fellow neighbor. Mr. Miller immediately informed the Sherriff's Office.

### The Investigation & Evidence

An autopsy report confirmed David was shot six times throughout his torso and head, and Maria was shot once in the upper torso. A total of fourteen .223 caliber shell casings were found at the scene where David's body was discovered; a same .223 caliber shell casing was also found in the desert where Maria's body was discovered. Ballistics analysis confirmed all fourteen shell casings were fired from the same rifle.

Two sets of shoe impressions were discovered—one described as having horizontal lines and circles, and the other similar to the first, a partial shoe impression with a tread design consistent with horizontal lines and circles. Both shoe impressions were present at both crime scenes.

The morning after the discovery of Maria's body, Detective Jorge Andrade confirmed her identity via vehicle-registration records and contacted Appellant by way of the information obtained from running the vehicle's plates. Detective Andrade drove to the provided address of Appellant and during this initial encounter, Appellant confirmed Maria was his wife, was driving her grey van, had not come home the previous night, and had last seen her at around 1 p.m. the previous day. Appellant also denied having any marital issues with Maria. Detective Andrade asked Appellant for a formal interview, which Appellant agreed to; Appellant drove in his own vehicle to the station and was *Mirandized* before the interview. This interview was recorded, admitted into evidence, and a transcript of it was read to the jury at trial. During this interview, Appellant provided a breakdown of his whereabouts on December 7, whereby throughout, he contradicted his story, and admitted to knowing his wife was seeing someone else.

A search warrant for Appellant's home was obtained, and during this search, Appellant was not honest about where his truck was located, a gas container was found outside of Appellant's home, and Appellant's cell phone was confiscated. The call log of Appellant's phone revealed Appellant had completely deleted all calls made before the day of the murders. A Walgreens receipt found in Appellant's truck also revealed Appellant bought hydrogen peroxide the evening of the murders. Appellant, and Alan Fraire, whom detectives believed was involved in the murders, were eventually both arrested pursuant to an arrest warrant.[1]

At trial, a latent print examiner testified as to the shoe impressions found at both scenes, several of the victims' co-workers testified as to the affair, and of instances of Appellant surveilling both Maria and David. Deputy Shane Brinks testified, who had previously responded to a family

---

[1] The State posits Appellant acted with the assistance of Alan Fraire in the commission of the murders of Maria Cuellar and David Miranda. Alan Fraire is a codefendant and was tried separately and convicted of capital murder in cause no. 20170D05623 and appeal case number 08-19-00275-CR.

violence incident between Appellant and Maria, the two neighbors who heard the gunshots on the evening of the murders testified as to their recollections. A crime scene investigator, a forensic scientist, and the medical examiner who examined both bodies, all testified as to their findings. Testimony was also heard from several of Appellant's and Maria's family members, who provided insight of the family dynamic and relevant private affairs leading up to the murders. On January 22, 2016, Appellant filed a claim for $125,000 as a beneficiary under Maria's life insurance policy. The records custodian at T-Mobile and an FBI agent specializing in CDR ("Call Detail Record") testified to their analysis which linked Appellant's phone to both crime scenes on the day of the murders.

### *Procedural Background*

Appellant was indicted of capital murder of multiple persons. TEX.PENAL CODE ANN. § 19.03(a)(7). Following a trial, the jury returned a unanimous guilty verdict and imposed an automatic life sentence in the Texas Department of Criminal Justice Institutional Division. This appeal followed.

## DISCUSSION

### *Issues*

Appellant appeals his conviction of capital murder. TEX.PENAL CODE ANN. § 19.03(a)(7). In three issues, Appellant challenges his conviction on grounds the trial court erred in admitting certain evidence, asserts jury charge error, and claims the evidence is legally insufficient.

## EXPERT TESTIMONY

In his first issue on appeal, Appellant argues he was harmed by the admission of Call Detail Record information and expert testimony he claims falsely connected him to the murders.

Appellant claims the State failed to prove the reliability of the evidence at trial and thus, its admission was error.

### *Applicable Law & Standard of Review*

A reviewing court evaluates a trial court's admissibility decision under an abuse of discretion standard. *Powell v. State*, 63 S.W.3d 435, 438 (Tex.Crim.App. 2001). Because trial courts are in the best position to make calls on questions of admissibility, we will uphold a trial court's admission of evidence if it falls within the zone of reasonable disagreement, and we afford great deference to a trial court in its evidentiary decision. *Martinez v. State*, No. 08-17-00165-CR, 2019 WL 4127261, at *7 (Tex.App.—El Paso Aug. 30, 2019, no pet.)(not designated for publication).

Expert testimony may be properly admitted if (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact finder in deciding the case. *Vela v. State*, 209 S.W.3d 128, 131 (Tex.Crim.App. 2006). A two-step inquiry governs the analysis: "A witness must first have a sufficient background in a particular field, but a trial judge must then determine whether that background 'goes to the very matter on which [the witness] is to give an opinion.'" *Id*. at 131. A trial court's determination of whether a witness possesses qualifications to assist the jury as an expert is afforded great deference. *Id*. at 136 Accordingly, when a trial court qualifies, or declines to qualify, a witness as an expert, that determination is rarely disturbed by reviewing courts. *Id*.

### *Analysis*

Appellant argues the CDR data and expert testimony should have been excluded because the data was not shown by expert testimony to be reliable. The State offered Exhibit 177 into

evidence—the cell phone records of Appellant, Fraire, Maria, and David, which were generated by T-Mobile. Kenneth LeCesne, a T-Mobile employee, testified as the custodian of records and explained as part of his employment, he is tasked with testifying as to cell phone records for purposes of record authentication and certification. LeCesne testified the CDR data was generated by T-Mobile in its regular course of business at or near the time of the cell-phone transactions recorded therein.

Appellant objected to the CDR data based on hearsay, a violation of the confrontation clause, and because it failed to constitute as a business record. After being overruled and further arguing he did not believe the cell phone company collected the data in its ordinary course of business, the court permitted Appellant to conduct *voir dire*. LeCesne testified to the authenticity of the records, and explained as the custodian of records, he could confirm the records were of the type kept by T-Mobile in the ordinary course of business. After further objections, the trial court admitted the records into evidence.

FBI Special Agent Sean Macmanus, a then twelve-year veteran, testified as a member of the FBI agency's Cellular Analysis Survey Team ("CAST"), he was certified to analyze cell phone records and testify as an expert witness. He described possessing over 400 hours of training relating to cell phone record analysis and technology, including training provided by T-Mobile. At the time of trial, Agent Macmanus had over three years of experience in analyzing CDR data, had previously been qualified as an expert, and explained CAST members had testified in over 1,200 cases in federal and state courts—100 of which he had personally completed—and historical-cell site analysis has been accepted in courts across the country for well over ten years.

Agent Macmanus used the CDR data provided by T-Mobile to conduct a report—a map of the cell towers Appellant's, Fraire's, and the victims' cell phones interacted with on the date of the

murders, which included the general locations of the four cell phones. Agent Macmanus testified extensively about the CDR process—cell phone companies maintain towers and these records essentially estimate the location of cell phone activity based on the coverage area of the tower. He explained cell phones are constantly looking for the clearest, strongest signal from a cell phone tower, and described his job consists of taking the CDR data provided by cell phone companies, which indicate which tower the phone was using, and then mapping the location to the designated tower the phone was using on the particular date and time. In addition, Agent Macmanus' examination and reporting of the cell phones in this case were peer reviewed, which strengthen its reliability.

Appellant focuses his argument not on the qualifications of Agent Macmanus, but on the State's failure to test the reliability of the scientific equipment—the actual cell tower antennae and computers used to process the CDR data in this case. Appellant doubts the reliability and asks:

> Were the computers working correctly? Did the computer software have any bugs? Did the carrier outsource the task of collecting, analyzing, and storing location information? Was the data retrieved reliably in response to subpoena or search warrant? Were each of the towers in question fully operational? Were the tower antennae calibrated properly? Had the antennae been inspected? Had any antennae inadvertently been caused to move since its last inspection? Had any antennae been damaged after its last inspection? Had the carrier changed its usual practices regarding an antennae to account for physical or atmospheric interferences? Were there spikes in usage that might affect which tower would receive a call? What fail safes were in place?

The State counters, no objections regarding the accuracy and reliability of the equipment were raised at trial, therefore, Appellant did not preserve error. We agree. As a threshold matter, preservation of error by a specific and timely objection at trial must be made to raise the issue on appeal. *See Moore v. State*, 371 S.W.3d 221, 225 (Tex.Crim.App. 2012)(an appellate issue that is not preserved at trial is ordinarily forfeited). In any case, we find Agent Macmanus was qualified

to testify as an expert in this case on the topic of CDR and we will not disturb the trial court's determination. Issue One is overruled.

## CHARGE ERROR

In Issue Two, Appellant argues the trial court erred by including what he alleges to be an impermissible comment on the weight of the evidence in the jury charge.

### *Standard of Review & Applicable Law*

Article 36.19 of the Texas Code of Criminal Procedure governs the standard for reversal on appeal in Texas regarding the requirements of Article 36.14, which relate to the charge of the court. TEX.CODE CRIM.PROC.ANN. art. 36.19. The judgment shall not be reversed unless the error appearing from the record was "calculated to injure the rights of [the] defendant" TEX.CODE CRIM.PROC.ANN. art. 36.19.

In reviewing charge error, we must first determine whether error actually exists, then evaluate whether the error was harmless. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984)(op. on reh'g). If error exists, the harm analysis differs depending on whether the charge was timely and properly objected to. *Id*. at 171. When the defendant has properly objected, jury charge error requires reversal when the reviewing court finds "some harm" to his rights. *Id*. The degree of harm must be actual, not just theoretical, and must be evaluated "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id*. at 171-74.

As a general rule, a jury charge should set forth the law applicable to the case; "it should not express any opinion as to the weight of the evidence, sum up the testimony, discuss the facts, or use any argument in its charge calculated to arouse the sympathy or excite the passions of the

8

jury." *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex.Crim.App. 2008). An instruction that assumes the truth of a controverted issue is a comment on the weight of the evidence and is erroneous. *Whaley v. State*, 717 S.W.2d 26, 32 (Tex.Crim.App. 1986). Because the jury is the exclusive judge of the evidence, and of the weight to be given to testimony, a trial court should avoid any reference in the jury charge to a particular fact in evidence. *Bartlett*, 270 S.W.3d at 150.

### *Analysis*

At trial, the jury was instructed, "[m]ere presence alone will not make a person a party to an offense." Appellant argues this constitutes a comment on the weight of the evidence because it singled out the primary issue in this case: whether Appellant was present when the murders occurred. Appellant posits the instruction invited the jury to pay particular attention to Appellant's presence, and in effect, suggested Appellant was in fact present, which he claims sufficed to prove his guilt.

Pursuant to the *Almanza* standard, we must first determine whether error exists. *Almanza*, 686 S.W.2d at 171. Because the charge was properly objected to at trial, reversal is required only if we find "some harm" to Appellant's rights. *Id*. at 171. The State argues Appellant has failed to demonstrate how the instruction singled out or suggested to the jury he was present at the crime scenes. The "mere presence alone" instruction is an accurate statement of the law, and although a seemingly neutral, legally accurate statement may constitute an improper weight on the evidence. *See Bartlett*, 270 S.W.3d at 152; *Martin v. State*, 200 S.W.3d 635, 642 (Tex.Crim.App. 2006)(Although the charge was deficient, it actually benefited defendant and thus, did not constitute harm.); *Grisby v. State*, No. 05-08-01351-CR, 2009 WL 2274101, at *2 (Tex.App.– Dallas July 30, 2009, no pet.)(not designated for publication)(Finding no harm where the charge, as written, arguably could have benefitted appellant.). We agree with the State and find it benefited

9

Appellant by emphasizing to the jury the State's burden of needing to prove more than mere physical presence. Accordingly, we find no resulting harm to Appellant. Issue Two is overruled.

## LEGAL SUFFICIENCY

In Issue Three, Appellant asserts the evidence is legally insufficient to support his conviction beyond a reasonable doubt.

### *Standard of Review & Applicable Law*

Under the Due Process Clause of the U.S. Constitution, the State is required to prove every element of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In *Brooks*, the Texas Court of Criminal Appeals held the only standard a reviewing court should apply when examining the sufficiency of the evidence is the legal sufficiency standard articulated in *Jackson*, which requires affording deference to the jury's credibility and weight determinations. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010). The critical inquiry in a legal sufficiency challenge is whether the evidence in the record could reasonably support a conviction of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007).

When reviewing the legal sufficiency of the evidence, we must view all of the evidence in the light most favorable to the verdict to determine whether any rational juror could have found the defendant guilty of the essential elements of the offense beyond a reasonable doubt. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex.Crim.App. 2005). A lack of direct evidence is not dispositive on the issue of the defendant's guilt; guilt may be established by circumstantial evidence alone. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004). We measure the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Thomas v. State*, 303 S.W.3d 331, 333 (Tex.App.—El Paso 2009, no pet.)(*citing Malik v. State*, 953 S.W.2d 234, 240

10

(Tex.Crim.App. 1997)). A hypothetically correct charge accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Malik*, 953 S.W.2d at 240.

We bear in mind that the trier of fact is the sole judge of the weight and credibility of the evidence, and we must presume the fact finder resolved any conflicting inferences in favor of the verdict and we defer to that resolution. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014) (*citing Jackson*, 443 U.S. at 319). A reviewing court may not reevaluate the weight and credibility of the evidence or substitute its judgment for that of the fact finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010). Our only task under this standard is to determine whether, based on the evidence and reasonable inferences drawn therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

Appellant was charged with capital murder of multiple persons. TEX.PENAL CODE ANN. § 19.03(a)(7). A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. TEX.PENAL CODE ANN. § 19.02(b)(1). A person commits the offense of murder of multiple persons if he murders more than one person during either the same criminal transaction or during different criminal transactions, but the murders are committed pursuant to the same scheme or course of conduct. *Id*. at § 19.03(a)(7). Thus, a hypothetically correct jury charge would ask whether Appellant: (1) intentionally or knowingly caused the deaths of Maria and David; (2) in the same scheme or course of conduct during either the same transaction or different criminal transactions. *Id*. at §§ 19.02(b)(1), 19.03(a)(7).

### *Analysis*

In the instant case, Appellant challenges the sufficiency of the evidence on the basis of the State's failure to call eye-witnesses, and the alleged lack of physical evidence connecting him to

11

the murders or murder scenes—specifically, no DNA or fingerprint evidence, no blood of the victims found in his truck, no tire tracks connecting him to the murder scenes, the negative shoe print match, no evidence of him smelling of gasoline after the van was set on fire, and no evidence of blood or mud found on his clothing or shoes. However, Appellant seems to negate the role of circumstantial evidence—a form of evidence customarily utilized by Texas courts to support convictions. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004)(We treat circumstantial evidence as being equally probative as direct evidence. A lack of direct evidence is not dispositive on the issue of the defendant's guilt; guilt may be established by circumstantial evidence alone.). Appellant further alleges the circumstantial evidence allowed the jury to convict him based on "mere speculation or factually unsupported inferences or presumptions."

The State focused on Appellant's motive and opportunity to commit the murders and we must analyze whether the *cumulative force* could support the jury's conviction beyond a reasonable doubt. *See Smith v. State*, No. 05-18-00491-CR, 2019 WL 1615353, at *7 (Tex.App.–Dallas Apr. 15, 2019, pet. ref'd)(mem. op., not designated for publication). At trial, the State admitted Appellant's recorded interview with Detective Andrade in which he denied having martial issues with Maria although he had filed for divorce on November 9, 2015, about a month before the murders. His divorce petition was based solely the allegation of adultery, and he sought custody of their only child. There was also ample evidence suggesting Appellant had been surveilling Maria and David for some time leading up to the murders, including testimony Appellant may have installed a tracking device on Maria's vehicle. Family members and co-workers of the victims testified as to the common knowledge of Maria's affair, her statements regarding her desire to divorce Appellant, and the fact she had already started moving out of the family home. Appellant was also the beneficiary of Maria's life insurance plan, which he filed a claim for soon after her

12

murder on January 22, 2016. The weight and credibility of this evidence tends to prove Appellant's motive to commit the murders, which we find was reasonable for the jury to deduce.

Appellant claims there was "no physical evidence to connect [him] to the murders or the murder scenes." We disagree. A total of fourteen .223 caliber shell casings were found where David's body was discovered and a same .223 caliber shell casing was also found in the desert where Maria's body was discovered. Ballistics analysis confirmed all fourteen shell casings were fired from the same rifle. Two local farmers (Mr. Miller and Mr. Guerrero) who resided near the crime scenes testified to hearing a total of ten-fifteen gunshots around the same time the murders occurred—upon hearing the gunshots, Mr. Miller and Mr. Guerrero exchanged a phone call and discussed the gunshots they both heard, which CDR data confirmed was consistent with the time the murders were said to have occurred. In addition, Susan Pedregon, a latent print examiner employed by the El Paso County Sheriff's Office as a crime scene investigator at the time of the murders, testified at trial. She testified as to the two shoe impressions found at both murder scenes and their distinctive characteristics. Detective Andrade testified that although there were no shoes found at Appellant's residence matching the prints found at the murder scenes, the actual length of the shoes Appellant wore on the day of the murders is consistent with the length of one of the prints found at both murder scenes. The shoes Appellant wore on the day of the murders were confiscated and taken into evidence; the shoes Appellant wore that day was confirmed by footage taken outside of a Walgreens on the evening of the murders, where he was seen buying hydrogen peroxide—the shoes, the Walgreens footage and the receipt of Appellant's purchase were all admitted into evidence.

Furthermore, the jury heard testimony from Sean Macmanus, an FBI agent and counterintelligence investigator who, as discussed above, is certified to analyze call data records.

Agent Macmanus testified as an expert, explained the CDR process, and confirmed that the CDR of Appellant's cell phone pinned him to both murder scenes on the day of the murders. FBI Agent Macmanus' testimony and the CDR analysis contradict and undermine Appellant's account of his whereabouts on the day of the murders. The CDR confirm that Appellant was in the area of the murder scenes on the evening of the murders when he claimed to have been at Fraire's residence in Socorro, and the CDR also indicate several calls were exchanged between Appellant and Fraire on the evening of the murders, which raises suspicion because he claimed to have been with Fraire in Socorro. When specifically asked, Agent Macmanus responded that in his "expert opinion, the phone could not be at the Fraire residence, making a connection to the two towers, all the way down in Fabens, near the crime scene, at the same time[,]" and based on the records, "[Mr. Cuellar and Mr. Fraire's] phones were using the same sectors." Further establishing Appellant's guilt, Agent Macmanus also confirmed that "all four phones [were] in the vicinity, or the area, of the canal shooting" and declared that, "based on my training and experience, in my expert opinion, based on the phone's activity, [Appellant's] phone moved from -- in vicinity of I-10 and Horizon Boulevard, the tower near there, south to the area around Fabens, that would be consistent with both Mr. Miranda's residence and the crime [scene]."

Appellant's motive and opportunity to commit the murders, which we find could have reasonably sufficed to prove the requisite intent, was demonstrated through the testimony and evidence presented at trial. As the ultimate trier of fact, the jury was free to judge the weight and credibility of the evidence and we defer to that resolution. *Dobbs*, 434 S.W.3d at 170. Our only task is to determine whether a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Isassi*, 330 S.W.3d at 638. Based on the evidence, the testimony, and the reasonable inferences drawn therefrom, we deduce a rational jury could have concluded

Appellant intentionally or knowingly caused the deaths of Maria and David in the same scheme or course of conduct during either the same or different criminal transaction. TEX.PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(7).

The evidence is legally sufficient to support Appellant's conviction. Issue Three is overruled.

## CONCLUSION

For these reasons, we affirm.


May 28, 2021

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J, Palafox, and Alley, JJ.

(Do Not Publish)

15