

# IN THE
# TENTH COURT OF APPEALS

## No. 10-22-00363-CR

**FRANKIE LEE BELL, JR.,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 85th District Court**
**Brazos County, Texas**
**Trial Court No. 18-01692-CRF-85**

## MEMORANDUM  OPINION

Frankie Lee Bell, Jr., was found guilty by a jury of the offense of capital murder.

*See* TEX. PENAL CODE ANN. § 19.03(a)(7).  The trial court assessed his punishment at life in

the penitentiary without the possibility of parole and imposed sentence accordingly.  Bell

now brings this appeal and complains in two issues that the trial court erred (1) by

allowing Detective Jared Cleere of the College Station Police Department to testify as an

expert on cellphone-tower data and (2) by overruling Bell's objection to the law-of-parties instruction in the guilt-innocence jury charge. We affirm.

## Issue One

In his first issue, Bell contends that the trial court abused its discretion by allowing Detective Cleere to testify as an expert on how cell towers and their directional antenna could be used to determine Bell's location during or after the murders.

AUTHORITY

A party can challenge expert witness testimony on at least three specific grounds. First, a party may allege that a witness does not qualify as an expert because the witness lacks the requisite knowledge, skill, experience, training, or education in the subject matter of the expert's testimony. *See* TEX. R. EVID. 702; *see also Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). Second, a party may allege that the subject matter of the testimony is inappropriate because it is unreliable. *See* TEX. R. EVID. 705(c); *see also Vela*, 209 S.W.3d at 131, 133–34; *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Third, a party may allege that the testimony will not assist the factfinder in deciding the case. *See* TEX. R. EVID. 401, 702; *see also Vela*, 209 S.W.3d at 131. These three requirements of expert testimony are referred to as qualification, reliability, and relevance. *See Vela*, 209 S.W.3d at 131. Each requirement raises distinct questions and issues, and an objection based on one of the requirements does not preserve a complaint based on another. *See*

*id.*; *see also Turner v. State*, 252 S.W.3d 571, 584 n.5 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd).

Additionally, a party in a criminal case has a procedural right to voir dire an expert under Texas Rule of Evidence 705(b).  *See* TEX. R. EVID. 705(b).  Under Rule 705(b), a trial court is required to permit a criminal defendant to conduct a voir-dire examination of an expert about the underlying facts or data upon which the expert's opinion is based, and this examination is required to be conducted outside the presence of the jury.  *Id.*  The examination allows the defendant to determine the foundation of the expert's opinion without the fear of eliciting inadmissible evidence in the jury's presence and may afford the defendant "sufficient ammunition to make a timely objection to the expert's testimony on the ground that it lacks a sufficient basis for admissibility."  *Shaw v. State*, 329 S.W.3d 645, 655 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (quoting *Goss v. State*, 826 S.W.2d 162, 168 (Tex. Crim. App. 1992)); *see* TEX. R. EVID. 705(c).

DISCUSSION

During trial, Bell requested a voir-dire examination of Detective Cleere.  The trial court granted Bell's request.  Bell then proceeded with his voir-dire examination of Detective Cleere in the presence of the jury.  While conducting the voir-dire examination, Bell objected to Detective Cleere's qualifications to testify as an expert on cellphone-tower data and about "whether a phone pinged off a particular tower."  These objections were overruled by the trial court.  After the voir-dire examination, Detective Cleere then

testified that Bell was in the proximity of the house where the murders occurred because several calls made from Bell's cellphone pinged off a cellphone tower near the house when the murders occurred. Bell did not request a running objection or object each time the objectionable testimony was presented to the jury.

Texas Rule of Appellate Procedure 33.1 sets out the general requirement that a contemporaneous objection must be made in the trial court to preserve a complaint for appeal. TEX. R. APP. P. 33.1. In order to preserve a complaint, the record must demonstrate that: (1) the complaining party made a timely and specific request, objection, or motion and (2) the trial judge either ruled on the request, objection, or motion, or refused to rule and the complaining party objected to that refusal. *See* TEX. R. APP. P. 33.1(a); *see also Haley v. State*, 173 S.W.3d 510, 516 (Tex. Crim. App. 2005). The objection must be made each time inadmissible evidence is offered unless counsel either obtains a running objection or requests a hearing outside the presence of the jury. *Haley*, 173 S.W.3d at 516–17; *see* TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(b).

We conclude that because the voir-dire examination was conducted in the presence of the jury without objection to the jury being present, and because Bell did not obtain a running objection or object each time the complained-of evidence was presented, Bell did not preserve his complaint about Detective Cleere's qualifications for appellate review. *See Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003).

In addition to complaining about Detective Cleere's qualifications, Bell also appears to challenge, for the first time on appeal, the reliability of Detective Cleere's expert testimony. This complaint was not raised in the trial court at all and, thus, was not preserved for appellate review. *See* TEX. R. APP. P. 33.1(a); *see also Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *Wright v. State*, 154 S.W.3d 235, 241 (Tex. App.—Texarkana 2005, pet. ref'd).

Accordingly, we overrule Bell's first issue.

### Issue Two

In his second issue, Bell complains that the trial court erred in overruling his objection to the inclusion of a law-of-parties instruction in the jury charge. Bell argues that "there was insufficient evidence to support it."

AUTHORITY

In reviewing a complaint of jury-charge error, we first determine if there was error; and if there was error, we decide whether the error caused sufficient harm to warrant a reversal. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Brown v. State*, 580 S.W.3d 755, 761 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd). The degree of harm necessary to warrant a reversal depends on whether the defendant objected to the jury charge. *Ngo*, 175 S.W.3d at 743; *Brown*, 580 S.W.3d at 761. If the defendant preserved his complaint with a timely objection in the trial court, and if the reviewing appellate court finds error, the record need show only "some harm" to warrant a reversal. *See Ngo*, 175

S.W.3d at 743; *Brown*, 580 S.W.3d at 761. The "some harm" standard requires error that is "calculated to injure the rights of the defendant." *See Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)), *overruled on other grounds by Sandoval v. State*, 665 S.W.3d 496 (Tex. Crim. App. 2022), *petition for cert. filed*, No. 23-5618 (U.S. Sept. 20, 2023). There must be "some actual, rather than merely theoretical, harm from the error." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In assessing the harm, we consider the entire jury charge, the state of the evidence, including contested issues and the weight of probative evidence, the arguments of counsel, and any other relevant information revealed by the record as a whole. *Sanchez v. State*, 376 S.W.3d 767, 774–75 (Tex. Crim. App. 2012); *Almanza*, 686 S.W.2d at 171.

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. *See* TEX. PENAL CODE ANN. § 7.01(a). A person is criminally responsible for an offense committed by the conduct of another if while "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2).

A trial court must charge the jury fully and affirmatively on the law applicable to every issue raised by the evidence. *Bargas v. State*, 252 S.W.3d 876, 901 (Tex. App.— Houston [14th Dist.] 2008, pet. ref'd). A law-of-the-parties instruction is proper if

sufficient evidence supports a jury verdict that the defendant is criminally responsible under the law of parties. *Id.* In making this determination, courts may consider events that occurred before, during, and after the commission of the crime. *Goff v. State*, 931 S.W.2d 537, 545 (Tex. Crim. App. 1996).

DISCUSSION

Here, the evidence showed that on the night of October 3, 2017, officers from the Bryan Police Department responded to a trailer located at 1506 Frankfort. Once on the scene, the officers discovered David Jenkins in the front yard with a gunshot wound and two other deceased individuals, Tarrant Franklin and Dominique Franklin, inside the trailer with gunshot wounds to their heads. Detective Daniel Amaya also encountered Karwanna Jones at the scene. Detective Amaya testified that Jones told him about the events of the evening, which Detective Amaya then described in detail to the jury as follows. Jones was accosted by a tall, thin black male after she got out of the shower. The assailant had his face covered by a handkerchief, but the handkerchief did not cover his entire face. The assailant pointed a gun at Jones and demanded to know where the money was. Jones was confused by the situation. A second assailant came into the room, pointed a gun at her, and yelled, "You think this is a game? Where's the money?" Jones quickly put on underwear before the assailants drug her into the living room where she saw Tarrant, Dominique, and Jenkins lying on the living room floor. The assailants placed her on the floor as well. Jones recalled hearing Tarrant yelling "[d]on't do this, don't do

this" in response to one of the assailants demanding where the money was. While Jones had her head down, she heard gunshots. There were two assailants in the living room, another assailant by the door, and possibly one more assailant.

Jenkins testified that on the day of the incident, he was working on a truck belonging to Tarrant and Dominique at Tarrant's and Dominique's trailer. While Jenkins was inside the truck, Bell approached the truck and saw Jenkins. Later that day, Bell returned to the trailer and told "everybody to go in the house." Jenkins saw three people holding guns and wearing masks, so he complied with the instruction to go inside the trailer. When he entered the trailer, Jenkins, Tarrant, and Dominique were ordered to lie down on the living room floor. According to Jenkins, Bell instructed Dominique to crawl to another room to get everything and kicked Dominique while he was crawling. Bell then had Dominique crawl back to the living room. Jenkins recalled that Dominique pleaded for his life, but Bell shot Dominique and then Tarrant in their heads. When Bell moved to shoot Jenkins, Jenkins got up and ran. Bell shot Jenkins in the arm. Jenkins confirmed that the shooter was Bell, explaining that Bell's mask came off before he shot Jenkins.[1] Jenkins noted that Bell remained in front of him during the incident. After getting what they wanted, the three men left, and Jenkins went outside. Jenkins testified

---

[1] After he was treated, Jenkins was asked who shot him. According to Detective Candido Amaya of the Bryan Police Department, Jenkins was unable to identify the shooter. Detective Amaya also testified that Jenkins did not tell him that a mask came off one of the shooters or that Bell shot him. Jenkins also was unable to identify Bell as the shooter in open court, stating that "[h]e's done changed."

that he has known Bell "[s]ince he was a kid wearing diapers." Jenkins also stated that the same day he got out of the hospital, "a guy came to me and [said], 'Hey, Frankie Bell told me to tell you that you ain't seen nothing.'"

Bell's second cousin, Lakeisha Stewart, testified that on the night of the incident, Bell called and wanted Stewart to give him a ride. Stewart waited some time at the spot they were to meet. Eventually Bell and Marcos Ray arrived and got into Stewart's vehicle. Stewart asked Bell what was going on, and Bell "didn't say anything. He just started crying and saying he had did him in . . . ." Before picking up Bell and Ray, Stewart had seen a news report about the murders and believed that Bell's statement indicated that he was involved. When Stewart asked what had happened, Bell stated that he "fucked up." Stewart then inquired as to why Bell killed Tarrant and Dominique, and Bell responded, "My mask came off." Stewart did not believe that Bell's tears were sincere because Bell and Ray indicated that "they were going to rob somebody else on Bittle Lane. And that's what happened." When Stewart dropped off Bell and Ray, she overheard Bell asking Ray if he "[got] the hitter" and telling Ray to "[g]et rid of it." Stewart knew this meant a gun. Stewart then saw Ray take out something wrapped in a white towel or white jacket. A few days later, Bell communicated to Stewart via text that she "was breaking his heart" for telling her mother what Bell had done.

Law enforcement initially identified Ray as a suspect and seized his cellphone. A search warrant was obtained to search Ray's cellphone, and Sergeant Travis Hines of the

Bryan Police Department testified about the following Google searches made on Ray's cellphone:

> [T]hey were specific to the KBTX story that ran on the news. He was constantly checking that over and over to see if there were new developments in the case. And there were a lot of Google searches based on whether or not water or rain can wash away fingerprints or affect anything of that nature; and it was raining that night on the night of the murder.

Sergeant Hines also found a photo of a silver Rock Island Armory revolver. The description given for the weapon used to commit the murders was that it was silver. Furthermore, the firearm in the picture appeared to be a .38 revolver, which matched the bullets and bullet fragments recovered from the crime scene. Additionally, Sergeant Hines described numerous text messages sent by Ray to Bell. Many of the text messages referred to various people talking about the murders. However, in one message sent "six minutes before the murder call came out," Ray asked Bell, "So you want us to go to the bushes now?"

Detective Lance Mathews of the Bryan Police Department described how Bell was arrested by the Bryan Tactical Team and the Bryan Negotiation Team. Bell was in a standoff with police at a house in Caldwell, Texas, for about an hour. When he was finally arrested, Bell had changed his appearance. Detective Mathews testified that he had listened to a call made by Bell where Bell talked about cutting his hair.

Detective Cleere testified that cellphone-tower data indicated that Bell placed or received several calls before and right after the time of the 911 call reporting the murders.

At the time of Bell's calls, his cellphone pinged off the cell tower nearest to 1506 Frankfort, where the murders occurred. Detective Cleere then traced the location of Bell's cellphone for the next ten hours, and that showed Bell's cellphone moving toward cell towers in Caldwell, where Bell was eventually apprehended.

Based on the record before us, we conclude that there is sufficient evidence that Bell, acting with intent to promote or assist the commission of the murders, encouraged, directed, or aided Ray in the murders of Tarrant and Dominique. *See* TEX. PENAL CODE ANN. § 7.02(a)(2). And even if it was error to submit the law-of-the-parties instruction in the guilt-innocence jury charge, "[w]here the evidence clearly supports a defendant's guilt as a principal actor, any error of the trial court in charging on the law of the parties is harmless." *Black v. State*, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986). We overrule Bell's second issue.

## Conclusion

Having overruled both of Bell's issues, we affirm the judgment of the trial court.

MATT JOHNSON
Justice

Before Chief Justice Gray,
  Justice Johnson, and
  Justice Smith
Affirmed

Bell v. State                     Page 11

Opinion delivered and filed November 2, 2023
Do not publish
[CRPM]

