

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ALAN FRAIRE, | § | No. 08-19-00275-CR |
| Appellant, | § | Appeal from the |
| v. | § | 171st Judicial District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20170D05623) |

# **O P I N I O N**

A jury convicted Appellant, Alan Fraire, of capital murder of multiple persons. TEX.PENAL CODE ANN. § 19.03(a)(7). He raises two issues in this appeal: (1) the legal sufficiency of the evidence to support his conviction, and (2) claimed error in the admission of expert testimony. We find no merit in either contention and affirm the conviction.

## I. FACTUAL BACKGROUND

Sometime between 7 and 8 p.m. on December 7, 2015, two neighboring pecan farmers in a rural area of Fabens heard multiple gunshots. That same evening, local firefighters were called to a reported "brush fire" at San Felipe Park. Upon their arrival, the firefighters instead encountered a vehicle engulfed in flames. The firefighters and responding El Paso County Sheriff's deputies noticed what appeared to be a body in the back of the vehicle. The firefighters

1

were careful to preserve the footprints they had previously seen around the vehicle. After the fire was extinguished, burnt human remains were recovered and later identified as Maria Cuellar ("Maria"). An autopsy report revealed Maria had suffered a fatal bullet wound to the torso before being set on fire. The sheriff's investigators determined the vehicle was registered to Vicente Cuellar who was Maria's husband.

Two days later--on the morning of December 9th--one of the farmers who had heard the gunshots on the evening of the murders, drove along a canal bank alongside his pecan orchard and saw a parked truck. As he approached, he saw a pool of blood on the canal bank and a body later confirmed to be David Miranda ("David"). An autopsy confirmed that David died from multiple gunshots throughout his torso and head.

Detectives soon learned that Maria and David, who were co-workers, were having an affair.

## A. The Investigation and Evidence

A total of thirteen .223 caliber shell casings were found at the scene where David's body was discovered; a .223 caliber shell casing was also found in the desert where Maria's body was discovered. Ballistics analysis confirmed all fourteen shell casings were fired from the same rifle. Two sets of shoe impressions were discovered at the scenes--one described as a loafer type of shoe, and the other as an athletic shoe. Both shoe impressions were present at both crime scenes, and did not match the shoes David died in.

The morning after the discovery of Maria's body, Detective Jorge Andrade obtained a search warrant for Vicente Cuellar's ("Cuellar") residence. During this search, authorities confiscated Cuellar's cell phone and truck. Cuellar's truck was particularly clean, and the call log of his phone later revealed that all the cellular activity for December 7th--the day of the murders--had been deleted. A Walgreens receipt found in Cuellar's truck reflected the purchase of

2

hydrogen peroxide on the evening of the murders. Video surveillance from the store confirmed this, and showed Appellant and Cuellar together inside the Walgreens--Cuellar made the purchase while Appellant stood right next to him.

### B. Appellant's Two Statements

On December 9th, Detective Andrade interviewed Appellant. The interview was admitted into evidence at trial both through a transcript and video that was played for the jury. During the first interview, Appellant denied having any knowledge of what happened to Maria. He claimed that on December 7th, he spent the day working on a car at a lady's house.[1] Cuellar came to his house at approximately 5 or 6 p.m. that day and the two worked on one of Cuellar's vehicles for a couple of hours. Cuellar and Appellant then went to Cuellar's house around 7 or 8 p.m. and by that time, Maria was not yet home from work. Appellant then dropped off Cuellar (who is an over-the-road truck driver) at Cuellar's semi-truck. Appellant then went home in Cuellar's GMC truck. He ran an errand with his wife and returned to his house at 8:30 or 9 p.m. where he stayed the rest of the evening. He claimed that he knew nothing about Maria having an affair, and claimed that Cuellar was incapable of hurting her.[2] Almost all of these claims contradict what he later revealed nine months later when he was interviewed a second time.

On August 30, 2016, sheriff's detectives interviewed Appellant a second time. This interview was also admitted into evidence and played for the jury at trial. In the second interview, Appellant initially denied any involvement in the murders and claimed he spent the day working on a woman's vehicle in the upper East side of El Paso, Texas until about 7 or 8 p.m. He then

---

[1] Sheriff's investigators confirmed this part of Appellant's claim.

[2] Appellant did relate that Cuellar claimed to have received some threats from persons associated with a Juarez, Mexico, cartel.

3

went straight home afterwards where Cuellar was waiting so the two could work on his truck. Detective Andrade then informed Appellant that his cell phone records and locations on the day of the murders did not align with his alibi. Detective Andrade explained that his cell phone records pinned his location in the Fabens area at the time of the murders, consistent with the locations of both murder scenes.[3] When asked, "Just tell us how you ended up being at those two locations with [Cuellar,]" Appellant hesitated for a while and responded, "You promise me you'll keep my family safe no matter what?" Appellant then began to unravel a sequence of facts that slowly revealed his involvement in the murders.

Appellant confessed that after Cuellar found out about the affair between Maria and David, Appellant agreed to surveil Maria in exchange for money.[4] On the day of the murders, he and Cuellar followed Maria to photograph her. Appellant claimed he and Cuellar spotted Maria and David at a local Burger King on the day of the murders. But rather than follow them when they left, he claimed they instead proceeded to order food and eventually traveled some distance to Fabens, Texas to the remote canal site where Maria and David were located.

Upon their arrival to the canal, Appellant claimed Cuellar saw Maria and David together, got out of the truck, and "just went crazy." Detective Andrade asked:

Q. Right, right. So he just went crazy and did what?

A. He shot them.

Q. With what?

A. With an AR-15.

---

[3] At trial, the records custodian for T-Mobile and an FBI agent testified to cell phone tower data which linked Appellant's phone to the areas of the crime scenes on the day of the murders.

[4] He also admitted to surveilling Maria with Cuellar about two to three times--once at the canal site, and once from across the street of where Maria worked.

However, Appellant denied seeing Cuellar pull out an AR-15 before getting out of the truck, and claimed he did not see the actual shootings and could not remember specifics because he was looking down at his phone on Facebook. He explained it was not until he heard gunshots that he looked up. After hearing the gunshots, he alleged he got out of the truck and saw the rifle for the first time. At this point, Appellant claimed he got back inside the truck and "took off," leaving Cuellar at the murder scene. Appellant said he intended going home, but while en route, Cuellar called him and asked to be picked up in the Fabens area, and also asked Appellant to bring gasoline.

Appellant agreed to Cuellar's requests, and said he purchased a gallon of gasoline and picked Cuellar up on San Felipe Road--the area where Maria's burnt remains were found. At first, Appellant said he gave Cuellar the gasoline when he picked him up, then Appellant changed his story and alleged Cuellar never took the gasoline. Appellant denied ever going to San Felipe Park and could not explain the two sets of shoe impressions at the murder scenes.

In the second statement, Cuellar was described as being unfamiliar with rifles whereas Appellant admitted to previously owning an AR type rifle and confidently confirmed knowing how to use an AR type rifle. Appellant also revealed that before the murders, Cuellar told him he wanted to purchase a rifle and asked if Appellant knew where and from whom he could get one.

### C. Trial Proceedings

Appellant was indicted for one count of capital murder of multiple persons and two counts of tampering with or fabricating physical evidence (a human corpse in Count II and an item in Count III). TEX.PENAL CODE ANN. §§ 19.03(a)(7), 37.09(c). At trial, the State advanced the theory that Appellant and Cuellar acted together in the commission of the murders of Maria and

David.[5]   The State presented its case through the investigating sheriff's officers who documented the physical evidence we note above, and Appellant's interviews.   The State called the two neighbors who heard the gunshots on the evening of the murders, a forensic scientist, and the medical examiner who examined both corpses.   The State also presented testimony through the records custodian for T-Mobile and an FBI agent who collectively, from cell tower data, linked Appellant's phone to the areas of the crime scenes on the day of the murders.   The jury also heard testimony about the affair leading up to Maria and David's murders, and Appellant's involvement in surveilling them.

The murder weapon was never recovered.   Nor did the State find any shoes in Appellant or Cuellar's possession that matched those at the scene.   Appellant offered no witnesses to testify on his behalf.

The jury returned a unanimous guilty verdict on all three counts and imposed an automatic life sentence in the Texas Department of Criminal Justice Institutional Division in Count I, and five years in Counts II and III, all to run concurrently.   This appeal followed.[6]

## II.   SUFFICIENCY OF THE EVIDENCE

Appellant raises two issues on appeal, the first claiming that the evidence is legally insufficient to support the capital murder conviction.

### A.   Standard of Review

The Fourteenth Amendment's guarantee of due process requires that every conviction must be supported by legally sufficient evidence.   *See Jackson v. Virginia*, 443 U.S. 307, 315-16

---

[5] Vicente Cuellar was tried separately and convicted of capital murder.   His conviction was recently affirmed by this Court.   *Cuellar v. State*, No. 08-18-00133-CR, 2021 WL 2184512 (Tex.App.--El Paso May 28, 2021, no pet. h.) (not designated for publication).

[6] On appeal, Appellant challenges only his conviction of capital murder of multiple persons.

(1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim.App. 2010). In a legal sufficiency challenge, we focus solely on whether the evidence, when viewed in the light most favorable to the verdict, would permit any rational jury to find the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 318-19; *Brooks*, 323 S.W.3d at 912 (establishing legal insufficiency under *Jackson v. Virginia* as the only standard for review of the evidence).

Circumstantial evidence is considered as probative as direct evidence in establishing guilt, and circumstantial evidence alone can establish guilt of an actor. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). A court assesses a sufficiency challenge by comparing the evidence presented at trial to the elements of the offense as "defined by the hypothetically correct jury charge for the case." *See Ramjattansingh v. State*, 548 S.W.3d 540, 546 (Tex.Crim.App. 2018), *quoting Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997) (en banc).

Applying that standard, we recognize that our system designates the jury as the sole arbiter of the credibility and the weight attached to the testimony of each witness. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex.Crim.App. 2020); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014). Only the jury acts "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007), *quoting Jackson*, 443 U.S. at 319. An inference must be reasonable and supported by the evidence at trial; it cannot be solely based on speculation. *Hooper*, 214 S.W.3d at 16. The Court of Criminal Appeals has distinguished speculation as "mere theorizing or guessing about the possible meaning of facts and evidence presented[,]" whereas a reasonable inference is a conclusion supported by the evidence at trial and reached by "considering other facts and deducing a logical consequence from them." *Id*. In drawing reasonable inferences, the jury remains at liberty to believe "all, some, or none of a witness's testimony." *Metcalf*, 597 S.W.3d

7

at 855.  When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination.  *Dobbs*, 434 S.W.3d at 170; *see also Jackson*, 443 U.S. at 319.

### B.  The States's Burden

Appellant was charged with capital murder of multiple persons.  TEX.PENAL CODE ANN. § 19.03(a)(7).  A person commits the offense of murder if he "intentionally or knowingly causes the death of an individual."  TEX.PENAL CODE ANN. § 19.02(b)(1).  A person commits capital murder if he murders more than one person during either the same criminal transaction, or during different criminal transactions, but the murders are committed pursuant to the same scheme or course of conduct.  *Id*. § 19.03(a)(7).  Additionally, in the instant case, the trial court instructed the jury on the law of parties and authorized the jury to convict Appellant either as the primary actor or as a party.  *See* TEX.PENAL CODE ANN. § 7.02(a)(2) (a person is criminally responsible for an offense committed by another if in acting with intent to promote or assist the commission of the offense, he solicited, encouraged, directed, aided, or attempted to aid the other person to commit the offense).  To prove the intent to promote or assist element, the State must show it was Appellant's conscious objective or desire for the primary actor to commit the crime.  *Metcalf*, 597 S.W.3d at 856.

Thus, a hypothetically correct jury charge would ask whether Appellant: (1) intentionally or knowingly caused the deaths of Maria and David, (2) in the same scheme or course of conduct during either the same transaction or different criminal transactions, and (3) possessed a conscious objective or desire for the primary actor to commit the crime.  *See* TEX.PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(7); *Metcalf*, 597 S.W.3d at 856.

8

### C. Application

In this case, Appellant challenges the sufficiency of the evidence based on the lack of evidence to prove he either murdered or aided Cuellar in the murders of Maria and David. Specifically, Appellant maintains: "This case presents a perfect example of the disaster which occurs when juries do not grasp the distinction between drawing reasonable inferences and speculation." Based on the circumstantial evidence presented by the State, we disagree.

Circumstantial evidence alone may be sufficient to support a conviction. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004) (". . . the lack of direct evidence is not dispositive of the issue of the defendant's guilt. . . . Circumstantial evidence alone is sufficient to establish guilt."). A reviewing court must analyze whether the *cumulative force* of the evidence could support the jury's conviction beyond a reasonable doubt. *See Clayton*, 235 S.W.3d at 778. In this case, the State admitted both of Appellant's recorded interviews that we believe, juxtaposed with the other evidence in the case, established his guilt at trial.

Appellant claims there was "no evidence whatsoever" he committed the murders, and that the jury based its guilty verdict solely on evidence of him being present at the crime scenes, purchasing gas for Cuellar, and lying or not being forthcoming enough to the authorities, which Appellant claims is merely speculative and thus, insufficient. But these are circumstances, along with others, that would permit a rationale jury to infer Appellant's guilt. And importantly, Appellant's own statement establishes that Cuellar shot and killed both Maria and David when Appellant was present at the scene. The circumstantial evidence is only needed to answer the corollary question of whether Appellant was a participant in those murders, or an accidental bystander.

9

Answering that question, the State showed that Appellant and Cuellar were close friends, and Appellant actively assisted Cuellar with his divorce proceedings. While Appellant first denied that he knew anything about the affair the victims were having, the State presented other evidence corroborating that Appellant assisted in surveilling Maria and David for some time leading up to the murders, (including Appellant's later admission of that fact and testimony that a tracking device may have been installed on Maria's vehicle). Some testimony showed that Appellant was being paid to obtain pictures documenting Maria's infidelity. Testimony also established that Appellant had discussed the affair with a friend of Cuellar and mentioned David by name, which revealed that he too, knew the identity of the man Maria was seeing.

Additionally, Appellant was familiar with guns, specifically, AR-style rifles of the type used in this case; whereas Cuellar was not. Appellant encouraged Cuellar to get a gun, and Cuellar asked for Appellant's help in acquiring a rifle shortly before the murders. Appellant initially fabricated an alibi (claiming he was in the area of his home with his wife at the time of the murders), which was refuted by cell-phone records placing him in proximity of the canal and burned-van crime scenes at the time of the murders.[7] Appellant could also not explain how he came to be present at the scene (that is, whether they followed Maria and David or whether Cuellar knew they would be at the canal). Additionally, the physical evidence showed that David's body had been thrown from the road onto the canal bank, not dragged (thereby suggesting that two individuals had done that).[8] While Appellant claimed that he panicked when he saw Cuellar with

---

[7] The jury heard testimony from Sean Macmanus, an FBI agent who is trained to analyze cell phone tower data records. Agent Macmanus testified those records confirmed that Appellant's cell phone was located in the areas of the murder scenes on the day of the murders.

[8] El Paso County Sherriff Bernadette Ortega testified that David's body was moved from where he was shot, but was picked up and tossed, not dragged. Because David's body was not dragged, we agree with the investigators and deduce two persons carried his corpse.

10

the gun after the shootings at the canal and fled in a panic in Cuellar's truck because he was afraid Cuellar was going to shoot him, there were *two* crime scenes, both with *two* sets of shoe prints, and *both* with shell casings.[9]   Appellant's story is further strained by his admission that he later returned, at Cuellar's request, with a gasoline can, but only picked-up Cuellar and took him home. Appellant never reported the murders to the police, despite ample opportunity to do so, and instead attempted to initially divert the authorities with the false claim that neither he nor Cuellar had any involvement.   Video footage taken outside of a Walgreens on the evening of the murders also showed that Appellant and Cuellar were seen together buying hydrogen peroxide.

Appellant's intent to commit, promote, or assist in the murders was demonstrated through the testimony and evidence presented at trial--namely: (1) his involvement in surveilling Maria, (2) the two sets of shoe prints and two locations of shell casings when Appellant's story would support only one, (3) the unlikelihood of not noticing Cuellar pulling an AR-15 out of the truck the two were occupying right before the shootings occurred, (4) testimony that one body was carried and not dragged, suggesting two persons moved the corpse, and (5) purchasing gasoline for Cuellar and picking him up in the area of the murder scenes.   As the ultimate trier of fact, the jury was free to judge the weight and credibility of the evidence and we defer to that resolution. *Dobbs*, 434 S.W.3d at 170.   Our only task is to determine whether a rational juror could have found the essential elements of the crime beyond a reasonable doubt.   *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010).   Based on the evidence, the testimony, and the reasonable inferences drawn from the totality of the circumstances, we deduce a rational jury could have

---

[9]  A total of thirteen .223 caliber shell casings were found where David's body was discovered, and a same .223 caliber shell casing was also found in the desert where Maria's body was discovered.   Ballistics analysis confirmed all fourteen shell casings were fired from the same rifle.   In addition, there were two sets of shoe impressions found at both murder scenes and there was testimony regarding their distinctive characteristics.

11

concluded--*not merely speculated*--Appellant either intentionally or knowingly caused the deaths of Maria and David, or at minimum, possessed the conscious objective to assist Cuellar in committing the murders. TEX.PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(7), 7.02(a)(2); *Metcalf*, 597 S.W.3d at 856. The evidence is legally sufficient to support Appellant's conviction. Issue One is overruled.

## III. EXPERT QUALIFICATION

In his second issue, Appellant asserts the trial court erred in qualifying Kiersten LaPorte as an expert in shoe-impression analysis. LaPorte is a forensic scientist in trace evidence analysis with the Texas Department of Public Safety's crime laboratory. At the time of this trial, she had testified one time before on shoe-impression analysis, but had reviewed fourteen shoe impressions in other cases. LaPorte testified that some of the shoe impressions taken from the crime scene may have been made by a Skechers brand athletic shoe, but she was provided no shoes for comparison. She was shown photographs from the scene, but herself did not testify that there were two sets of prints at the scenes.[10] On appeal, Appellant argues that her testimony was irrelevant, particularly given that no "Skechers" brand type shoe was collected from either Cuellar or Appellant.

### A. Standard of Review and Controlling Law

A reviewing court evaluates a trial court's admissibility decision under an abuse of discretion standard. *Powell v. State*, 63 S.W.3d 435, 438 (Tex.Crim.App. 2001). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts

---

[10] The Sheriff's Department crime-scene investigator, Susan Pedregon, testified that there were two different sets of footprints at the burned-out vehicle. Another crime scene investigator, Bernadette Ortega, likewise testified to the same two sets of prints at both the burned-out vehicle and canal scenes. Neither set matched the shoes that David had on at the time of the murder.

arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex.Crim.App. 2019). Because trial courts are in the best position to make calls on questions of admissibility, we will uphold a trial court's decision if it falls within the zone of reasonable disagreement, and we afford great deference to a trial court's evidentiary decision. *Martinez v. State*, No. 08-17-00165-CR, 2019 WL 4127261, at *7 (Tex.App.--El Paso Aug. 30, 2019, no pet.) (not designated for publication).

Expert testimony may be properly admitted if: (1) the witness qualifies as an expert by reason of knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact finder in deciding the case. *Vela v. State*, 209 S.W.3d 128, 131 (Tex.Crim.App. 2006). A two-step inquiry governs the analysis: "A witness must first have a sufficient background in a particular field, but a trial judge must then determine whether that background 'goes to the very matter on which [the witness] is to give an opinion.'" *Id.* at 131. A trial court's determination of whether a witness possesses qualifications to assist the jury as an expert is afforded great deference. *Id.* at 136. Accordingly, when a trial court qualifies a witness as an expert, that determination is rarely disturbed by reviewing courts. *Id.*

### B. Preservation

Before addressing the merits, the State points out that Appellant is actually complaining about the relevance of the expert's opinion, while the only objection at trial was directed to the expert's qualification. Accordingly, no relevance objection as to Ms. LaPorte's testimony at trial has been preserved for appellate review. We agree.

As a threshold matter, preservation of error by a specific and timely objection at trial must be made to raise the issue on appeal. *See Moore v. State*, 371 S.W.3d 221, 225 (Tex.Crim.App.

2012) (an appellate issue that is not preserved at trial is ordinarily forfeited). At trial, after establishing Ms. LaPorte's qualifications, the prosecutor offered her as an expert to testify as to the shoe impressions found at the murder scenes. Defense counsel objected, and when the court asked for the legal basis of the objection, defense counsel requested a *voir dire* examination. After *voir dire*, defense counsel stated, "I'm going to renew my objection . . . I don't think they've . . . established that she has the requisite expertise in this particular subdiscipline and at this juncture in her career." The court overruled the objection and admitted Ms. LaPorte as an expert in forensic trace evidence analysis. Defense counsel objected yet again, reiterating Ms. LaPorte's lack of expertise in the field, and the court returned to *voir dire* examination of the witness. After further establishing Ms. LaPorte's expertise, she was again offered as an expert. The court asked defense counsel if she renewed the objection to which defense counsel responded: "Yes, Your Honor." The objection was overruled, and Ms. LaPorte was admitted as an expert.

At trial, Appellant objected to Ms. LaPorte's lack of expertise--the first *Vela* factor. *See Vela*, 209 S.W.3d at 131 (the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education). Now on appeal, Appellant specifically asserts: "In this case it is precisely relevance which is at issue. Laporte's testimony was simply not relevant in this case[]"--the third *Vela* factor. *See id*. (admitting the expert testimony will actually assist the fact finder in deciding the case). Thus, we find Appellant failed to preserve this issue for appellate review.

In any case, our review of Ms. LaPorte's testimony establishes that she offered no more than what Sherriff Ortega had already testified to regarding the shoe impressions found at both murder scenes. Furthermore, because Appellant placed himself at the murder scenes in his recorded interview, which was played for the jury, we find no resulting harm in the trial court's

qualification of Ms. LaPorte as an expert. Accordingly, we will not disturb the trial court's determination. Issue Two is overruled.

For these reasons, we affirm the conviction.

JEFF ALLEY, Justice

June 17, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)